STATE v. ANDERSON TANKERSLEY, ARTHUR KELLY, AND CLYDE WILSON.

(Filed 6 December, 1916.)

1. Criminal Law—Criminal Negligence—Evidence—Homicide.

In order to hold one a criminal for a negligent act of omission or commission, the act complained of must be a higher degree of negligence than is required to establish negligent default on a mere civil issue, and in order to a conviction of involuntary manslaughter, attributable to a negligent omission of duty, when engaged in a lawful act, it must be shown that a homicide was not improbable, under all the facts existent at the time and which should reasonably have an influence and effect on the person charged.

2. Same—Locomotive Engineer—Collision—Signals.

Three northbound trains were ordered to pass at a certain station at night, the first to proceed to the station and stop on a parallel track, the

second 1,200 feet south of the station, an irregular stopping place, and near a cross-over switch by means of which it could have taken an available siding, but which was permitted to remain on the main track for seven minutes until collided with by the third, a fast passenger train required to make its schedule, which it was then making. South of the location of the second train the track curved 2½ or 3 degrees for a distance of about 600 feet, and at its southern termination was an electric signal, with another such signal about 1,000 feet further south, both operated at the railroad yards beyond, and with which the prevailing conditions of the track should have been shown, but the first showed track was clear and the second that the main-line track switch was set for a side-track and that the engineer can proceed to the station "prepared to stop within the limits of his vision." There was nothing to indicate to the engineer of the third train that the second one was ahead on the main-line track, and that he should stop his train; and the employees on the second train failed to comply with the company's rules to place torpedoes behind them on the track or send a man back with a lantern to warn approaching trains. *Held*, the evidence was insufficient to convict the defendant engineer on the third train of manslaughter, in the absence of evidence that he was aware that a train was ahead of him on the track at the time, or that a homicide would reasonably be expected to follow from anything that he did or failed to do.

**3. Criminal Law—Homicide—Nonsuit—Appeal and Error—Judgment—Verdict.**

Upon motion to nonsuit upon the evidence on a trial for a homicide, now allowed by statute, when it appears that the evidence is insufficient for conviction, the action will be dismissed, and, under the statute, the judgment thereof has the same force and effect as a verdict of not guilty.

INDICTMENT for murder of C. E. Hall and H. C. Severs, tried before *Ferguson, J.,* and a jury, at May Term, 1916, of ROWAN, the charge being that the killing of these persons was caused by the criminal negligence of the defendants Anderson Tankersley and Arthur Kelly, engineer and fireman on train No. 38, and Clyde Wilson, flagman of train 2d No. 32, both being trains of the Southern Railway Company going north from Charlotte via Salisbury, N. C., and by reason of which No. 38 ran into 2d No. 32, stationary on the north main line of the Southern road, about 1,200 feet south of the railway station at Salisbury. The killing of the persons stated by train 38 and the attendant circumstances having been shown forth in evidence, defendant, as allowed by chapter 73, Laws 1913, in apt time, moved that the action be dismissed as on judgment of nonsuit. The motion was allowed as to the fireman, Arthur Kelly, denied as to the other two defendants, and, these being put on trial, there was verdict of not guilty as to Clyde Wilson and defendant Tankersley was convicted of manslaughter. Judgment on the verdict, and defendant excepted and appealed.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*A. H. Price, L. H. Clement, and T. F. Hudson for defendant.*

HOKE, J. We have given this case the careful consideration that the supreme importance of the issue demands, and are of opinion that the conviction of manslaughter cannot be sustained. The facts in evidence tended to show that on the night of 24 November, 1915, three fast passenger trains of the Southern Railway departed from the station at Charlotte, N. C., going north via Salisbury, No. 32, the regular train from Jacksonville to New York, leaving Charlotte at 8:06 p. m., second No. 32, the "Baseball Special," leaving Charlotte at 8:10; No. 38, the S. W. Limited from New Orleans to New York, leaving Charlotte at 8:31; this last being a heavy train on a fast run and expected and required to make its schedule time. That first No. 32 arrived at Salisbury at 9:14 and was allowed to proceed on up to the station; that second 32 arrived at Salisbury at 9:30 and was stopped 1,200 feet south of the station on the main line of the north-bound track and not far south of the cross-switch, by which north-bound trains were let in on parallel side-tracks leading up to the station; there were three of these side-tracks, all available to this train, if so directed, so far as the evidence shows; that this train remained on the main track at the point indicated seven minutes, until 9:37, when it was run into by train No. 38, and two of its passengers killed, those mentioned in the bill of indictment, and many others seriously injured; that proceeding south from the position of second No. 32, the main tracks curve to the right, on a curvature of 2½ to 3 degrees, which extends for about 600 feet, when the road again goes off at a tangent; that at or about the southern termination of this curve and at the ice factory crossing there is an electric signal, No. 3370, with double arms, the upper arm being to indicate conditions of the main tracks; that most of these block signals on the Southern Railway have only one arm, but this and another just north of the station, No. 3363, have two; that further south, on the tangent, about 1,000 to 1,200 feet from the ice factory signal, there is another electric cautionary signal, its purpose being chiefly to give notice of conditions prevailing at the ice factory or block signal; that these two electric signals are controlled from the yard at Salisbury and that at the ice factory can be made to show only red lights, which called for a stop of approaching trains, and it can also show, by red upper and green lower light, the conditions existent at the time of the catastrophe; that the main-line track switch is set for one of the diverging side-tracks and that the engineer can proceed to the station, prepared to stop within the limits of his vision. The proof showed further

that the stop made by second No. 32 was an irregular stop, and, when one of that character occurred, the flagman was required by the rules of the company to proceed immediately back and "protect his train"— "Go back eighteen telegraph poles and put down one torpedo, then go back nine poles and place two torpedoes, ten yards apart, then come back to one and remain until called in. If a first-class train is due within ten minutes he would have to stay there and come in on that train. If the evidence in this case should show that the special or second 32 was between the passenger station and the switch south of the cross-over diverging switch into the station, it was the duty of the flagman to proceed back at once in accordance with Rule 99, and if train 38 was due to arrive at that point within ten minutes it was the duty of the flagman on second 32 to stay there and flag 38, inform them where his train was, and come in on the engine of 38. Rule 99 is a rule that applies to flagmen."

2. That this was a most unusual stop, one of the State's witnesses testifying that he had never known a passenger train stopped at that place since he had been connected with the Southern Railway, and, in view of the fact that a fast passenger train was scheduled to arrive in the course of a few minutes, a stay there of seven minutes was an inexcusable stop unless the train had been fully protected by proper and adequate signals, and the evidence is uncontradicted that no such protection was afforded or even attempted. Second No. 32 was provided with torpedoes and with a red lantern, but no flagman went back to place former, and no adequate attempt even was made to protect the train with a lantern. The conductor of second No. 32 testified that, after being there for a few minutes, he saw the flagman at the end of the train with a white lantern, and he told him he had better go back and look out for 38; that the flagman had to go into his train and get his red lantern, and, almost immediately after he had started back, the light of No. 38 was seen as it came around the curve from the south. According to testimony, the flagman only got back about 200 feet, and there is much disinterested testimony to the effect that he did not leave the rear of his train. Again, under the circumstances disclosed by this evidence, with that train filled with passengers on the north-bound main line and south of the cross-over switch, with No. 38 approaching around a curve and to arrive in a few minutes, these electric signals, by every rule of prudence, should have called to the engineer to stop. It was shown that it could have been done by a simple turn of the hand by some one in the yard; but no such warning was given. On the contrary, the testimony tends to show that the cautionary signal at

the cotton mill crossing gave indication that the track was clear and the ice factory signal gave no order to stop his train, but that "the main line switch is set for one of the diverging tracks; proceed with caution and be prepared to stop within the limits of your vision." This, as argued by counsel, was at best an indeterminate signal, leaving much to the discretion of the engineer of the approaching train, "both as to speed, distance, and vision."

The testimony on the part of the State varies as to the exact speed to which defendant had reduced his train at the time of the collision, different witnesses giving it, by estimate, at 10, 15, 18, and 20 miles per hour; but, under the circumstances disclosed by the record, with only a signal of that character to guide him and with nothing whatever to show that there was a passenger train between him and the cross-over switch or any likelihood of it, even if he had not reduced his train to the speed required by the highest prudence, or even if he did fail to stop it within 120 feet, the distance he was able to see ahead, around the curve, this, while it might be considered an error of judgment, or even a negligent default on a civil issue, should not by any reasonable or just estimate of his conduct be imputed to him for a crime. The decisions of the courts have described in different terms the kind of negligence required to constitute crime. In some of them it is said to be negligence that is "culpable and gross." In others, that it must be such as to show a reckless disregard of the safety of others, etc., but all of the authorities are agreed that in order to hold one a criminal there must be a higher degree of negligence than is required to establish negligent default on a mere civil issue, and that in order to a conviction of involuntary manslaughter, attributable to a negligent omission of duty, when engaged in a lawful act it must be shown that a homicide was not improbable under all the facts existent at the time and which should reasonably have an influence and effect on the conduct of the person charged. As apposite to the facts of this record, the position is very well stated in 1 McLean's Criminal Law, sec. 350, as follows: "A negligence which will render unintentional homicide criminal is such carelessness or recklessness as is incompatible with a proper regard for human life. An act of omission as well as commission may be so criminal as to render death resulting therefrom manslaughter. But the omission must be one likely to cause death." Many cases on the subject show this to be a correct statement of the principle and are against the validity of the present conviction. *S. v. Vines,* 93 N. C., 493; *S. v. O'Brien,* 32 N. J. L., 169; *S. v. Moore,* 129 Iowa, 514; *S. v. Goetza,* 83 Conn., 437; *People v. Barres,* 182 Mich., 179; *Fergu-*

*son's case,* Lewis Crim. cases, 181; 1 Russell on Crimes (9 Ed.), pp. 877-878; 21 Cyc., p. 765.

Recurring to the facts in evidence, as we are enabled to understand them, the defendant on the night in question was the engineer on a fast passenger train going north, and expected and required to make his schedule, and was running on his usual time. A cautionary signal 1,600 or 1,700 feet south of the switch gave no indication that the track ahead was obstructed in any way; another signal, 600 feet back, gave him no order to stop his train, but only, "Switch turned for diverging track; proceed with caution, prepared to stop within the limit of your vision." There were no torpedoes placed to warn him that a train, filled with unsuspecting and helpless passengers, was on the track ahead and exposed to destruction; not even a red lantern waved at any point likely to give him notice. There was not only nothing to warn him of the perilous position of second No. 32, but it was not shown that he had any knowledge of the existence of such a train on that night, and the only signal given him, to our apprehension, signified that there was no train between him and the cross-over switch where he was notified to go in on a side-track. On the record, therefore, defendant should not be convicted of the crime of manslaughter, because of an utter absence of proof that a homicide could have been reasonably expected to follow from anything that he did or omitted to do, and his motion to dismiss the case against him should have been allowed.

This will be certified, to the end that the prosecution against the defendant be dismissed and that under the statute the judgment shall have the force and effect of a verdict of not guilty.

Action dismissed.