[Crim. No. 3784.   Second Dist., Div. Three.   Sept. 28, 1944.]

THE PEOPLE, Respondent, v. ANITA MONTECINO, Appellant.

Frederic H. Vercoe, Public Defender, and William B. Neeley, Deputy Public Defender, for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

DESMOND, P. J.—The appellant, Anita Montecino, charged with having murdered one Encarnacion Mata, waived her right to a jury trial and was found guilty by the court of the crime of manslaughter, a lesser offense included in the original charge against her. Her applications for a new trial and for probation were denied and she was sentenced to imprisonment in the California Institution for Women at Tehachapi. She appeals from the judgment and from the order by which she was denied a new trial, asserting that the verdict [judgment] by which she was found guilty of manslaughter was contrary to and not supported by law or evidence.

This contention calls for our consideration of the facts presented at the trial and the relation to those facts of section 192 of the Penal Code, which reads: "Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. 2. Involuntary—in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." The death of Mrs. Mata did not ensue "upon a sudden quarrel or heat of passion": the conclusion, therefore, must be drawn that the manslaughter of which appellant was convicted was "involuntary." If it be argued that Mrs. Mata's death did not result from the commission of an "unlawful act, not amounting to a felony," we still feel that appellant's conviction must stand, on the ground that the death resulted from the "commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." Her counsel contends that "in our instant case there is not only a failure to establish the commission of an act by the defendant of a character which might in itself be expected to produce death, but there is in fact a complete failure to prove the commission by the defendant of any act either dangerous or innocuous." To us, however, considering the treatment accorded Mrs. Mata, necessarily detailed hereinafter, it appears that she died as the result of a lawful act which might produce death, and did produce death, committed by appellant "without due caution and circumspection."

The People, in putting on their case, produced witnesses who came in contact with the deceased or the appellant within a period of approximately six months, extending from October of 1942 to April of 1943, when Mrs. Mata died.

Dr. W. D. Edwards, who for many years was a resident physician at Rancho Los Amigos, an institution of Los Angeles County, testified that Mrs. Mata, who had come to the hospital in February of 1942, left there in November of that year and at that time she was in "Fair Health. She was not what we call real active, in other words, she was not up and around, but she was able to sit up in a wheel chair, and she could get out of the wheel chair at times." He stated that Mrs. Mata had a broken leg and that she had never been able

to walk on it during the time she was at Rancho Los Amigos; that she was able to use a bedpan ''With help. She, of course, could help herself after a fashion, but it was safer to have help''; that at the time she left the hospital she had no bed sores on her back; that while she was there she had a clean bed and room; ''she was cared for every day. The attendants took good care—— in fact, our cases that are bedridden, they have to take special pains to keep them clean so the tissue doesn't break down or they don't have bed sores. Q. Was there special care given to her? A. Yes, the same as any bed case; in other words, they have the routine care.'' On cross-examination, he stated that while Mrs. Mata occasionally was taken to the toilet she ''frequently used the bedpan in bed. Q. And when you say it was safer for her to have help to use the pan, that would be on account of the cleanliness? A. That was to prevent her soiling herself being in the bed. . . . Q. Do you have any recollection of whether she was able to control her bowels? A. She was regarded as tidy, yes. That is the word we use for patients who are able to control themselves. She was tidy.''

Mrs. Mata left the Rancho hospital at about the time her adult son Mauro was called into the Army of the United States. For several years previously, Mauro, whom we shall hereafter refer to as ''the son,'' and his mother had lived in a duplex house on Beaudry Avenue in the city of Los Angeles. One-half of this house was occupied by the defendant. In a condemnation proceeding the State of California took the real estate upon which this house was located and which belonged to the decedent, and since Mrs. Mata was anxious to leave the hospital an arrangement to accomplish that was made on a Sunday in the latter part of October, 1942. According to the son, the defendant, upon being notified that it would be necessary for her to vacate the premises which she occupied in the .duplex house, stated that she would look for a house large enough so that she could take his mother with her and take care of her. He further testified that he, upon the suggestion of the defendant, accompanied her and a Mr. and Mrs. King, the latter a niece of Mrs. Mata, to the hospital at Rancho Los Amigos, where, according to his testimony, the defendant made her proposition to the decedent, telling her ''that she would take care of her, and that she would apply something to her leg, that she would have her walking .in a few weeks; and

then my mother consented to have her do something for her leg so that she could walk. . . . She said that she had treated a man that couldn't walk, and after she had applied something to his leg, that he was walking, he later walked, in a short time. . . . She said that it would be an easy matter for her to take care of my mother. I asked her how she was going to do it. She said, 'Well, I know what I am doing. She will be all right. She will be walking very soon.' . . . She said that in taking care of my mother, she would pay half of the rent of the house to live there in taking care of my mother, and that I was to pay the other half. So I went and rented that house and paid a whole month's rent. Q. You say you rented the house. Where was that? A. 162 South Clarence. . . . Q. What did your mother state to that proposition of moving in with Mrs. Montecino? A. She said it would be all right. Q. And what did you say about that? A. I just wanted to keep her satisfied. She wanted to come out and said if she can't get along or got sick, why, she would go back to the hospital. Q. Did you tell Mrs. Montecino that? A. Yes, I told Mrs. Montecino that in case she couldn't take care of my mother and would not like to take care of her any more, or that my mother would become sick, to call the doctors and send my mother to a hospital. Q. And what did Mrs. Montecino say to that? A. She said yes.''

The house at 162 South Clarence Street was an eight-room house. The son of the decedent was inducted about the middle of October but did not leave Los Angeles until approximately the second of November. In the preceding fortnight his mother was moved from the Rancho to the house at 162 South Clarence Street, taking there ''two trunks, clothing and a lot of bedding, sheets and pillows and spreads, blankets, and dresses, hats and shoes.'' The house was rented unfurnished except for a small dresser. Mrs. Mata's room was close to the kitchen. The son testified that his mother's bed was ''a Simmons bed. It was clean, clean sheets. The whole thing very clean when she first came in that house''; that the bed springs were woven ''straight across''; that the mattress was heavy, about ''eight inches thick'' and came with the bed and springs from the house formerly occupied on Beaudry Avenue; that the mattress was practically new and ''it was clean.'' This witness stated that he was in the home with his

mother approximately two days before he left for army duty; that during that time he was in the house most of the day and the defendant was then working; "she said that in case she had to leave the house that she would get some one to take care of my mother while she was away. Q. Was your mother able to get up and go to the toilet? A. No, she couldn't even turn to the side by herself. Q. Your mother used a bed pan, did she? A. No, they had to hand it *or* [over] to her. Q. I mean she used one when her bowels moved and when she urinated? A. Always, yes. Q. Was she able to put the bed pan under herself? A. No. Q. And during the time that you were there who took care of that? A. I did, and Mrs. Montecino. Q. And who fed your mother during that time? A. I did, and also Mrs. Montecino. Q. What was your mother's condition as you saw her at the time you last saw her before you went into the army? A. Her health and condition was good. I asked her how she felt and she said, 'I feel very good. There is no pain. I have no pain. I don't feel any pain and I feel fine. I want to get up and walk.' Q. During the time that you were there did you see Mrs. Montecino apply any treatment to your mother's leg? A. No. Q. Did you talk to her about that? A. No, I didn't, because she had always stated that in a few days she would take care of that." The witness stated that "I told Mrs. Montecino that I would send money for my mother's care, and for her to buy whatever she needed for my mother. I left my mother about $85.00 before I left. He further stated that he sent money orders following his entry into the army, "one . . . in about the middle of November, 1942 . . . close to $50.00," and others, at different times, "$10.00, $20.00, $30.00, and sometimes $50.00." He also stated that he left some money in the care of Mr. King, who "was to see that mother would have whatever was necessary for her to have, for her maintenance." He also made an allotment to his mother from his army pay, $50 per month. He was discharged from the army on March 29, 1943, having reached the age limit for active service, and arrived home about the 4th of April and called to see his mother. He was asked, "What was the first thing that you noticed or saw when you went in there? A. There was a very bad odor there, worse than any chemical or fertilizer. It was an odor that it is hard to describe, be-

cause it was a combination like when a dead body or a dead animal is already decayed. It seemed as though it, would just try to push you out of the room, it was that strong. I have smelled fertilizer in packing houses, and it wasn't anything in comparison to the odor in this room. Q. You mean the odor in your mother's room was worse than you smelled in the fertilizer or packing houses? A. Oh, yes. . . . Q. Now, did you notice the bed upon which your mother was lying? A. Yes. Q. Will you describe it as you saw it? A. The sheets were almost black. They were real dark from filth and a lot of dirty stuff there. There were several packages and paper bags along the side of the bed close to the wall. Q. Now, you say the sheets were black with filth. Did you notice what was on the sheets? A. Yes. Q. What was it?'' The witness then proceeded to describe in detail the disgusting condition of the bed and said that he noticed in the room some stale bread and cookies, a glass of water, a pear and on the bed a bedpan that required emptying. He stated: ''I told Mrs. Montecino that my mother appeared to be very sick, and she was in need of medical attention, and that should be done right away; and she didn't say anything to that, so I just kept on and said that I was grateful and she had been patient enough to be taking care of her, but my mother was in such condition now that she couldn't be in that house any more, 'I am going to take her to the hospital,' I told Mrs. Montecino. Q. What did Mrs. Montecino say to that? A. First I mentioned that I was going to call the doctor, and then she said that no doctor would come into the house. I said 'Why?' I said 'Just because the place is dirty?' I said 'The doctor won't take notice of that. My mother needs a doctor in the case.' She says 'No doctor can come in there,' so I said 'Well, then, I will call the hospital and have them take her over to the hospital.' 'Well,' she says, 'Well, I told you nobody would get in here.' I said, 'All right, what are you going to do, let her die here?' She wouldn't talk any more from there on. Q. Did she say anything about her lawyer? A. Oh, she said that her lawyer told her not to leave my mother out of the house. Q. Now, did you notice the condition of your mother's back? A. Yes. Q. What was that? A. In very bad condition, with large open sores, some of them were bleeding. **Q. Whereabouts—— A. Sir? Q. Whereabouts on her back were these**

sores? A. Close to the hips and on the hips. Q. And what was the condition of her body there as to being clean or dirty. A. Oh, it was very dirty. She had a very white skin, and you could see in the place there all black and the sores were round like a ring, black, and her white skin, it looked filthy, dirty, . . .'' He testified that some of the excrement which he noticed was in some of the sores; that the mattress was wet and filthy and on one side close to the center there was a black spot which showed that it had been rotted through.

The son, being advised by appellant that she would not permit his mother's release, then went to various authorities of city and county in an effort to get his mother into a hospital. It appears from the testimony of other witnesses that after the son's return from army service, the County Hospital sent an ambulance for his mother but the attendants failed to get into appellant's house on South Clarence Street. The son also went there with a radio car from the Hollenbeck station, on two or three different occasions, and then to the Red Cross. He learned that representatives of the Red Cross had been to the South Clarence Street house where his mother was confined and were unable to get in. ''They sent me to the legal clinic and they told me to go and bust that door. I thought I would get in trouble doing that, so I kept on trying to do it legally, so I went to the Public Defender in the City Hall and she couldn't do very much of anything but she tried to get a habeas corpus on her and finally I went to the County Public Defender. They told me that they couldn't do anything. I went finally to the District Attorney's office. . . . I got an order and the Sheriff went over there to the house and got my mother out.'' The evidence showed that the son, failing to secure relief from the various agencies which he consulted in his effort to remove his mother from the control of the appellant, finally swore to a complaint charging his mother with insanity, upon which a warrant for her apprehension issued.

While the son was endeavoring to get his mother into the hospital, he went to the house with a Dr. Camilo Servin, whose name had been given him by the Red Cross. Relating his experience there, Dr. Servin, who appeared as a witness in this case, stated: ''I went up to the porch and knocked. . . . and I continued knocking, at the front door, and nobody answered, and then I kicked and nobody answered, and I hit it

with my flashlight and nobody answered. And then I went to the back door and knocked there. It was hooked with a bicycle lock from the outside, and then nobody answered, so I went forward, walking toward the front and I saw there was a window with a screen, so I called for Mrs. Mata and she answered''; that he talked with Mrs. Mata for about ten or twelve minutes, and at the end of the conversation lifted the screen of the window to enter the room, and the defendant then asked him what he was doing there; ''I told her that I had come to see Mrs. Mata, that the big boss wanted to know her condition and what was her state of health. She said that the big boss had nothing to do with it; that it was nobody's business what they wanted to know about Mrs. Mata. I don't remember exactly the words. I have an idea. Later on she—— at first I didn't tell her the son had sent me, but later on I told her that the son had sent me and that the son wanted to know what the condition of his mother was. She told me that the son had nothing to do with it; that it was not the son's business. I also asked her during the conversation if she was related to Mrs. Mata. She said she was her daughter. Then later on during the conversation I told her that Mr. Mata had told me he was the son and that Mrs. Montecino was no relation whatever. She then admitted that she was no relation. Then she said that nobody had any right to go in the house. I told her in the conversation that she was quite sick. She said that wasn't my business or anybody's business. Then she came close to the window where I had my head in and told me to get out and said it in a very harsh way. . . . Q. During any part of the conversation did Mrs. Mata say anything? A. Yes, she said 'Let him come in,' addressing Mrs. Montecino. Q. What did Mrs. Montecino say to that? A. 'No, you can't come in.' Q. Was that after you had said you were a doctor? A. Yes, I had told her already that I was a doctor, that I had come to inquire about the health and state of Mrs. Mata. Q. Was there any mention made of the police department? Did Mrs. Montecino say anything about the police department? A. I told her that the son, the Red Cross, myself and the police department all wanted to know what the situation was, the condition of Mrs. Mata. She said it was nobody's business, not even the police or the Red Cross or mine or nobody else's business. I asked her why she insisted on not

letting anybody in and she said that was her business and nobody else's business.'' It appeared, on cross-examination of Dr. Servin, that Mrs. Montecino told him that Mrs. Mata said she didn't want to go to the hospital and didn't want to have any doctor come and see her; that she wanted to stay where she was.

Mr. King, the husband of Mrs. Mata's niece, testified that for about three months after Mrs. Mata was moved to the house at 162 South Clarence Street, he and his wife visited her at weekly intervals and for the first three months the bed was in pretty good condition, but early in February, when he was there, it was getting dirty and filthy; that on the occasion of their last visit Mrs. Montecino asked them to leave at the end of a few minutes, saying that she wanted to go to bed, although it was only then 7:00 or 7:30 p. m. He further testified that when the son came home from the army he asked him to call upon his mother to give her advance notice of his return, but that when he called at the house and told Mrs. Montecino that he had a message from Mauro Mata, she said, ''You just can't see her.'' He testified that on one occasion in February Mrs. Mata said to Mrs. Montecino, ''Why don't you let him come in? I pay my rent here,'' and Mrs. Montecino said, ''You are not paying anything.''

During the son's absence in the army his mother was visited by several church workers, all of whom experienced difficulty in obtaining entrance to the house where she was confined. One of these, a Mrs. Mary Louise Hernandez, testified that toward the latter part of February or the first of March she called and found the room and the bed in a very filthy condition; that she fixed up the bed and rubbed Mrs. Mata's back with alcohol; that at that time Mrs. Mata ''had a real red ring around her hip here and she said it hurt her very badly and burned.'' On the next day when she called she found Mrs. Mata in a filthy condition; that Mrs. Mata said that she had nobody to clean her. This witness testified that Mrs. Mata had some red spots on her back ''big and red'' over part of her ''buttocks.'' This witness further testified that at the time of her visits there were no open or running sores on Mrs. Mata's back but that a number of red spots were present.

Another church worker, Mrs. Esther Lopez, testified that the condition of the bedroom was ''Awful . . . it was very terrible . . . it wasn't clean, unsanitary''; that it smelled ''Like

a person hadn't been taking good care of her clothes, cleaning or anything, for a long time."

Ben Doughty, ambulance driver for the County Hospital, testified that on April 20, 1943, he made a trip to 162 South Clarence Street shortly after dark and that he had an attendant with him; that he told the defendant that he and the attendant, both of whom were dressed in uniform, were there to get Mrs. Mata, who was sick; that she motioned to the two men to get out and was talking Spanish in a very harsh and angry tone; they stayed around there for about fifteen minutes and left; that they did not get into the house.

William J. Brennan, another employee driving for the County Hospital, testified that he went to the house at 162 South Clarence Street on the following day; that he had orders to go there and that a psychopathic warrant was out and held by a deputy sheriff, Mrs. Van Oevern [possibly meaning Mrs. Van Oedein], who accompanied him and an attendant, Jack Rivers; that he was dressed in the regulation uniform. According to his testimony they met two male deputies upon their arrival at the house and, failing to get any response to a rap on the front door, some of their number went around to the back door where they knocked several times. When the defendant did not open the door the deputy broke in. Previously, Deputy Sheriff Losey told defendant that if she did not open the door he would break it down. When he started to read the warrant to her the defendant was standing in the middle of the kitchen floor and started to go out into another room, but the deputy "sat her down in a chair." When the deputy told her that they were there to take Mrs. Mata to the hospital, the defendant said, "no, that she had papers," went to another room and came back with a paper which some of the officers read. The witness stated that he did not read all that was in the paper but did read something "about an agreement of $150.00 a month." After all this, the defendant tried to force her way into the bedroom where Mrs. Mata was in bed, so the detective "sat" her in a chair and kept her out of the way until Mrs. Mata was placed on a stretcher and taken out to the ambulance. This witness stated, "The whole house was vile. It seemed to be closed up, no air got in, and the whole house when we first opened the door there was a terrible odor. . . .It was just

about as foul as you could smell.'' There was no light in the patient's room. They were able to see their way by aid of a flashlight. He was able to see the bed ''and the mattress was rotted right through, a hole possibly 18 inches or two feet in diameter was rotted right through to the springs,'' and he could see the springs through the hole. In the bed was foreign matter that was caked directly around the patient and up to the edge of the hole from her feet and it looked as though it had been there for some time. Some of it appeared to be dry. The patient's nightgown, according to this witness, had a hole rotted through the back of it and was filthy. So were the bed clothes on the bed.

Mrs. Van Oedein gave substantially the same testimony as the witness Brennan.

One Harry L. Karson, a deputy sheriff and a warder of the Psychopathic Department of the General Hospital, stated that on the night of April 21, 1943, he received Mrs. Mata at the hospital. She arrived about ten minutes after ten in the evening. He saw her condition upon her arrival. This witness testified that he saw objectionable foreign matter upon her body, as well as stains and bedsores, some of them large enough to ''insert my finger all the way into the bone.'' He said he remembered two such holes distinctly and perhaps there were three; that while cleaning the lady, he saw wadded paper and this paper had on it the color of blood and foreign matter; that the nightgown she wore when she came in was dirty; that some of this wadded paper was folded three or four or maybe five thicknesses and wrapped around a cork.

Alice Landreth, a witness for the People, testified that she was an attendant at the County Hospital in the psychopathic department and saw Mrs. Mata about 10 o'clock on the night of April 21, 1943; that she helped remove Mrs. Mata from the stretcher to a bed. She described the awful condition of Mrs. Mata, as it had been described by other witnesses, and stated that the packing on Mrs. Mata's right hip consisted of a ''bunch of paper . . . and under this paper was a large lesion and a cork, and the cork was removed right from this lesion on the right hip.''

Dr. Robert E. Garrett, an interne at the Los Angeles General Hospital, saw Mrs. Mata shortly after 10 o'clock on the night of her arrival. According to his testimony her body was stained with fresh blood and in certain areas had fecal

material on it; that her nightgown appeared to have rotted in one particular portion in the back, and that rotted area was eight inches in diameter and the edges were encrusted and stained with fecal material and smelled of urine; that the larger lesions on her body were open and were oozing a fluid, that there was blood coming from the large lesion and there was induration around the edges and the lesions were deep. He stated that her feet and ankles were swollen; that the skin was discolored to a purplish brown and the pulse was barely palpable in both feet and that they were cold to touch. This condition, he said, is characteristic of early gangrene; that there may be multiple causes for gangrene and that the open sores could have been one of the causes. He testified that the patient did not respond to treatment and died seven or eight days after admission to the hospital.

Dr. Frank R. Webb, Chief Autopsy Surgeon for Los Angeles County, performed an autopsy upon the body of Mrs. Mata on the day of her death. She was apparently seventy-two years of age and the doctor found, upon his examination, "bed sores, ulcerated deep and infected areas over all exposed bony prominences of the back, with a large, deep abscesses [d] area over the right hip." The doctor testified that the cause of death was "general arteriosclerosis due to senility," and upon being asked whether he found any contributory cause of death, answered, "Yes, the abscessed condition or ulcerated condition of the bed sores was such as to create a marked or great septic condition throughout the whole system and it would have been a contributory factor. Q. And in your opinion, then, would that condition have hastened the death even though she was suffering from arteriosclerosis? . . . A. In my opinion, the septic condition did contribute to her death. Q. . . . In your opinion did it hasten the death? . . . A. Yes sir." Toward the close of the doctor's testimony he was asked a hypothetical question based upon objectionable conditions related as existing by the various witnesses, some of which we have summarized, the question closing with the inquiry, "what effect, in your opinion, would these facts have in contributing to or hastening the death of the person referred to in the former question? . . . A. In my opinion, the unsanitary condition, malnutrition and septic condition from ulcerated bed sores hastened her death." It

appeared from the testimony of Dr. Webb, elicited upon cross-examination, that he found swelling and evidence of gangrene about the bedsores and he stated that, in his opinion, the infection and the conditions surrounding it hastened the death of Mrs. Mata.

On the afternoon of May 26th, the defendant was interviewed in the office of the District Attorney of Los Angeles County, the questions propounded to and the answers made by her, being incorporated in a statement which was read to the trial court by stipulation of counsel, the defendant not appearing as a witness on her own behalf in this trial. Certain quotations from the statement and language therein, which we have italicized, are of special interest. For example: "Q. And when he [Mauro] left what did he do with his mother? A. He took her out of the hospital and brought her to my house. Q. What arrangements did he make? A. *For me to take care of her.* When he worked he would send the money and *I am to take care of her.* . . . Q. What were you to do? A. I told him not to worry because she was very affectionate towards me, in agreement with me *for me to take care of her.* He told me he was going to pay me, but he didn't give me one cent for my work. Q. That is, she didn't give you any of the money she received from him? A. No, not a penny. Q. What did Mrs. Mata do with the money? A. She said she was very much in debt, she owed money and bills that she had to pay for. [It is possible that this inquiry concerning money had reference to a fund of $85 in cash which Mauro Mata testified he left with his mother at the time he went to war, saying that she had that money in a small bag pinned to her nightgown.] Q. *What care did you give Mrs. Mata?* A. *I got a woman to take care of her in the house.* . . . I just *got her to take care of her until* I would come out of work." Inquiry was made concerning Exhibit 2, an employment agreement, which was translated to the appellant by the interpreter and which appellant stated was signed by Mrs. Mata and herself. We note that according to its preamble appellant was "*acting* as practical nurse" for Mrs. Mata. [Italics ours.] Appellant was asked, "Now when Mario [Mauro] Mata went away to war and left his mother with you, you were to be the one to take care of her, is that right? A. Yes. . . . Q. There were several times that

the authorities wanted to take Mrs. Mata away to the hospital, weren't there? A. Yes. Q. But you didn't let them take her away, did you? A. No, because she didn't want to go. Q. And you refused them permission to take her away, is that right? A. I presented the paper so they would respect the paper, but they didn't respect the paper or anything. Q. So they took her away? A. By force, and one officer was holding me by force. Q. You knew she was very sick, didn't you? A. She was all right in the house. She wasn't very serious. Q. She had bed sores, didn't she? A. One sore came out but I was treating it very much. Q. How did you treat it? A. Pomades, creams and things like that, whatever is good for a sore. Q. What did you put over it? A. Cotton, tape. Q. Did you put anything in it to keep it from running? A. Just cotton, and stuff like that. Q. And a cork helped out to keep it from running? A. No, I didn't put that, I would just put things—— light things. Q. How about the cork in one of her bed sores, what about that? A. She had some tape and medicine. Q. With a cork under it? A. Did she have that? I never put it there. Q. She had a cork in a bed sore with a piece of tape or paper over it. A. I don't know how that could be. I don't know whether the doctor who came there—— Q. You saw that on her, didn't you? A. The doctor came there without my knowledge. He sneaked in and maybe he did it. Q. He did what? A. The doctor came in through a window and he came in the house arguing with me—— because by force he wanted to—— and then I don't know what he did to her. Q. You mean the doctor came in the house and put the cork in a bed sore and a piece of paper over it? A. Yes. Q. About how many days before she was taken out was it that that happened? A. About three days. Q. But the cork remained in the bed sore with a paper over it until she was taken out. A. Maybe yes, if he put it there. Q. Would you have put a cork in her bed sore with paper over it yourself? A. No, I wouldn't put any paper over it, just cotton and tape. Q. Why didn't you take that paper and cork off? A. Because they didn't give me a chance. Q. Who didn't? A. They came there without my knowledge for her. Q. You had three days to take that off? A. Yes, I didn't know but what every day the doctor would come there unbeknown to me.''

The balance of the interview related largely to the treatment accorded Mrs. Mata, specifying the awful conditions in which she was kept, as later described by witnesses at the trial and shown by physical evidence produced before the court, including the photograph, Exhibit 4. This photograph was taken by the Los Angeles Police Department and according to detective Gilbert, who testified at the trial, represents fairly the mattress which he saw when he called at 162 South Clarence Street on the 8th day of May, approximately one week after Mrs. Mata's death. We have examined this exhibit, as well as Exhibit 5, which shows the bedsprings, with the mattress removed, and other articles which have been mentioned in this recital. The condition of the mattress and the bedding indicates the so-called care given by this practical nurse to her unfortunate patient. Some inquiry was made also concerning the refusal of the defendant to permit the removal of Mrs. Mata to the hospital. She denied neglecting the care of Mrs. Mata and claimed that in refusing to permit the ambulance attendant to take her to the hospital she was carrying out the wishes of Mrs. Mata.

It has been a distressing task to review the evidence offered in this case and, while witnesses other than those mentioned appeared, we feel that the points urged by appellant can be decided, with fairness to her, upon the record hereinbefore set out.

In 29 Corpus Juris 1159, we find the statement that ''one who undertakes the care of an infant or other helpless person, although not related to him, is chargeable for the duty to care for him within the rule [i. e. that the defendant must have been under a legal duty imposed either by law or contract to care for the deceased and a mere moral obligation is not sufficient].'' It can hardly be questioned, in the instant case, that the defendant was under a legal duty imposed by contract to care for Mrs. Mata and, in our opinion, the court was justified in finding that in the performance of that duty she failed so egregiously as to be responsible for the death of her patient. Section 484, Wharton's Criminal Law (12th ed.), volume 1, page 714, carries the caption: ''Killing helpless person by neglect is manslaughter.'' The author then says, ''The doing an act, or the imperfect performance of a duty, toward a person who is helpless, which naturally and ordinarily leads to the death of such person, is murder, if

death or grievous bodily harm is intended; and manslaughter, if the cause is negligence [footnote cases]." In certain jurisdictions, it appears from 29 Corpus Juris, *supra,* 1158, that "A charge of manslaughter may be predicated upon a failure to act as well as upon an act. Willful failure of a person to perform a legal duty, whereby the death of another is caused, is murder, but if the omission was not willful, but was the result of gross or culpable negligence, it is involuntary manslaughter." (See *Stehr* v. *State,* 92 Neb. 755 [139 N.W. 676, Ann.Cas.1914A 573, 45 L.R.A.N.S. 559]; *State* v. *Tankersley,* 172 N.C. 955 [90 S.E. 781, L.R.A.1917C 533].) In the Stehr case, according to a statement by appellant's counsel appearing at page 560 (45 L.R.A.N.S.), "Being guilty of negligence is not the engaging in an unlawful act within the Criminal Code, so as to hold the defendant responsible for the death of another, while the slayer is engaged in the commission of an unlawful act." The Supreme Court of Nebraska, however, held, according to the note on this case at 10 American Law Reports 1138 "that the evidence was sufficient to justify a finding by the jury that the defendant was guilty of such criminal negligence as would amount to manslaughter, where it appeared that during a very cold night the feet of a boy of four years, a stepson of the defendant, were frozen, that on the discovery of that fact by the defendant's wife, about five days later, and that the feet began to show signs of discoloration, the defendant applied hot water and dressed them with cloths saturated with vaseline, but that no physician was consulted or called until ten days later, when the child's feet were so badly decomposed that the stench arising therefrom had become unbearable, that the feet were then amputated, but blood poison had developed to such an alarming extent that recovery was impossible; that defendant was a fairly intelligent man, surrounded by friends and neighbors who were able and willing to render him any necessary assistance, but to whom he failed to mention the child's condition. The court said: 'The degree of negligence in such a case that would make a man criminally responsible can hardly be defined. It is not a slight failure in duty that would render him criminally negligent, but a great failure of duty undoubtedly would. The line between the two extremes . . . is a question that must be

left to a great extent, in each individual case, to the common sense of the trial jury. It is for them to determine whether or not the degree of failure of duty is in fact criminal.' '' The Tankersley case, *supra,* at page 535, quotes with approval 1 McClain's Criminal Law, section 350, as follows: '' 'Negligence which will render unintentional homicide criminal is such carelessness or recklessness as is incompatible with a proper regard for human life. An act of omission as well as of commission may be so criminal as to render death resulting therefrom manslaughter. But the omission must be one likely to cause death.' ''

▮ Parenthetically, we may say that it is established in the State of California that involuntary manslaughter may result even though the conduct of the offender is not wanton or reckless. See comment by the Supreme Court in denying a hearing in *People* v. *Seiler* (1922), 57 Cal.App. 195, 201 [207 P. 396]: ''The statute (Pen. Code, § 192, subd. 2) defines involuntary manslaughter of this specific character as the unlawful killing of a human being, involuntarily, but 'in the commission of a lawful act which might produce death . . . without due caution and circumspection.' In order to constitute this kind of manslaughter the act may be lawful but it must be one which might produce death, and which does produce death, and it must be committed without due caution and circumspection. The lack of due caution and circumspection need not go to the extent of being wanton or reckless, although it might possibly be such as would be defined as culpable. But the word 'culpable' is not an apt description of the idea intended to be conveyed by the words 'due caution and circumspection.' On this subject see Note II to the case of *Johnson* v. *State* (1902), 61 L.R.A. 277.'' At page 294 of *Johnson* v. *State, supra,* we find the following: ''And where the death of an aged, infirm woman is caused by confining her against her will, and not providing her with food and clothing, fuel and medicines, and other necessaries, and not allowing her the enjoyment of the open air, in breach of an alleged duty, if the neglect is so wilful and gross as to warrant the inference that the person confining her contemplates her death, he is guilty of murder; but if it is occasioned by his negligence, not contemplating death, it is manslaughter only. *Reg.* v. *Marriott,* 8 Car. & P. 425. And

where an elderly woman was incapable, through illness, of attending to her own wants, or obtaining assistance, and a niece of full age, living with her and supported by her, receiving and having access to articles of food during the time, failed to supply either food, or medical attendance, or nursing to her aunt, or to make her condition known, whereby her death was accelerated,—— the niece is guilty of manslaughter, it being her duty, under the circumstances, to supply the wants of the deceased. *Reg.* v. *Instan,* 62 L.J.M.C.N.S. 86 [1893] 1 Q.B. 450, 41 Week.Rep. 368, 17 Cox C.C. 602, 57 J.P. 282, 5 Reports, 248, 68 L.T.N.S. 420. And an overseer of the poor who had under his care a poor person belonging to his township, for whom he had neglected or refused to provide necessary food, whereby she was reduced to a state of extreme weakness, and afterwards, through want of such reasonable and necessary food, she died, may be held criminally responsible for such death. *Rex* v. *Booth,* 1 Russ. & R.C.C. 47, note.''

We have noted the appellant's complaint that ''the trial court, in his capacity as the trier of the fact, was guided in his verdict by an erroneous concept of law,'' but, having read the remarks made by the trial court at the time he denied the appellant's motion for a new trial, we cannot agree with this contention.

Judgment and order affirmed.

Shinn, J., and Wood (Parker), J., concurred.