**UNITED STATES of America, Appellee,**

v.

**Mario Jaime ESCAMILLA, Appellant.**

**No. 71–1575.**

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1972.*

Decided Aug. 17, 1972.

---

* This case was originally argued December 9, 1971, before Winter, Craven and Field, Circuit Judges. Before the decision of the panel, the court, on its own motion, entered an order directing reargument in banc.

Francis X. Grossi, Jr., Washington, D. C. (William E. McDaniels and Williams, Connolly & Califano, Washington, D. C., on brief), for appellant.

Brian P. Gettings, U. S. Atty. (Justin W. Williams, Asst. U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER, CRAVEN, BUTZNER, RUSSELL and FIELD, Circuit Judges, sitting in banc.

WINTER, Circuit Judge:

■ Defendant, Mario Jaime Escamilla, was convicted of involuntary manslaughter, in violation of 18 U.S.C.A. § 1112, perpetrated on Fletcher's Ice Island T–3, an unclaimed island of ice in the Arctic Ocean, and sentenced to imprisonment for three years. In his appeal, his first contention that the district court was in error when it ruled that the special maritime and territorial jurisdiction of the United States extended to crimes committed on T–3 is one upon which the in banc court is equally divided and so we affirm the district court's exercise of jurisdiction. We agree, however, that there were errors in his trial, and so we reverse the judgment of conviction and remand the case for retrial.

I

T–3 is an island of glacial ice, composed of approximately 99% ice and less than 1% land matter, which meanders slowly about the general area of the Arctic Ocean.[1] First sighted by an American in 1947, T–3 has been occupied since 1952 under the auspices of the United States Government, particularly the Departments of the Air Force and Navy, except for part of the years 1961–1962 when the island was grounded on the coastline of Alaska near Point Barrow. T–3 is used as a research station—a platform for scientific study, and it is particularly well suited for this purpose because of its controlled environment and its unique stability. The research operations on T–3 are supported by the Naval Arctic Research Laboratory, funded by the Office of Naval Research, under contract to the United States Government. The laboratory supplies equipment and materials and designates a person to be the station manager of the group of men on the island. Personnel from several entities man the island—United States Geological Survey, Lamont Geological Laboratories, University of Washington, University of California, and the General Motors Defense Research Laboratory.

Discipline and order on the island depend upon the cooperation of all of the men and the effectiveness of the group leader, particularly in the summer months when it is virtually impossible to

---

1. At the North Pole, unlike the South Pole, there is no land mass. Rather, there is a vast ocean with an average depth of about 2,000 fathoms or somewhat over two miles, largely covered by an ice cap. Clute, The Ownership of the North Pole, 5 Can.Bar Rev. 19 (1927).

remove any wrongdoer from the ice. There are no medical facilities on the island, no doctor and, indeed, during the summer of 1970, no person trained in any aspect of medical science.

In May of 1970, a group of men arrived on T–3 expecting to remain there until late September or early October. Included were (a) the deceased, Bennie Lightsey, an employee of the United States Weather Bureau, who had been designated as station manager by the Arctic Research Laboratory, (b) the defendant, an employee of General Motors Defense Research Laboratory, (c) Donald Leavitt, who was an employee of the Arctic Research Laboratory, and whose nickname was "Porky," and (d) sixteen others. During the summer an acute problem arose from Porky's excessive drinking and resultant uncontrolled behavior. Prior to July 16, 1970, the date on which Lightsey was killed, Porky, at least three times, attacked various personnel at the station, including defendant, with butcher cleavers, mainly in an effort to obtain access to alcoholic beverages.

On July 16, while defendant was working at the General Motors camp, approximately one mile from the main camp where he lived in a trailer, he received a telephone call from his roommate, Charles Parodi, who told him that Porky was drunk and had taken some wine from their trailer. It should be noted that locked doors on T–3 were unknown because of potential fire hazard. Parodi pleaded with defendant to return to the trailer and defendant undertook to do so. He took with him a rifle selected from the common store to protect himself from the drunken Porky when he arrived back at the camp and later he loaded it. When defendant returned to the trailer he left his rifle and went to the next trailer to warn Porky to stay away from the raisin wine which was stored in defendant's trailer. Defendant found Porky and the station manager, Lightsey, consuming 190 proof Ethyl alcohol cut with grape juice and home made raisin wine.[2] Defendant then returned to his trailer and soon thereafter heard footsteps approaching. Believing that it was Porky, he raised the rifle, put the safety off, opened the bolt, and assuring himself that the rifle was loaded, returned the bolt to the firing position and pointed the gun at the door. It was not Porky, but Lightsey, who entered the trailer.

A discussion of increasing intensity then ensued between the two over whether or not Porky should be allowed some of defendant's raisin wine. Parodi was present for part of the discussion, but after he left defendant ordered Lightsey out of the trailer, waving the gun back and forth at him. The gun discharged and Lightsey was hit. Lightsey died a short time after the wound, despite the efforts of members of the camp, including defendant, to save him. There was no witness to the actual shooting, except the two participants, but there was evidence, on which the defense heavily relied, that the rifle was defective in an unforeseeable but most deadly way, i. e., it could be discharged without pulling the trigger by banging it, by dropping it, by putting the safety on and off, by ramming the bolt handle down, and by applying slight pressure to the bolt handle when holding it.

II

Aside from his jurisdictional contention which we are unable to decide, defendant contends that these reversible errors were committed: (a) the district court abused its discretion in declining to transfer the trial from the Eastern District of Virginia to the Central District of California, the district within which defendant maintained his perma-

---

2. An autopsy on the body of the deceased showed his blood alcohol content at the time of his death to be at least .26—a level sufficiently high to cause a substantial impairment of judgment.

nent residence;[3] (b) the district court failed to charge the jury correctly on the necessary elements of the crime of involuntary manslaughter and self-defense; (c) the district court improperly failed to conduct a hearing as to whether the witness Charles Parodi had given a statement to which defendant was entitled to access under the Jencks Act, 18 U.S.C.A. § 3500; and (d) the district court improperly and prejudicially limited defendant's use of character witnesses.

■ We see no merit in the contention that the district court abused its discretion in refusing to transfer the case. The pathologist, the ballistic experts and the government investigators, who would testify for the government, all had a regular place of business within the Eastern District; and the government agreed to produce all witnesses who had been on T–3 within the Eastern District at government expense. The only witnesses who had no connection with the Eastern District, or who would not be produced within the Eastern District at government expense, were character witnesses who might be called by defendant. We do not doubt that the testimony of a character witness *may* be more persuasive within the district where he resides than without, but this is only one factor to be considered in the weighing of conveniences attendant upon decision of a motion to transfer. When all of the factors are considered, including the enormous inconvenience to the government of trying the case in the Central District of California, we cannot find any abuse of discretion on the part of the district court in denying the transfer.

■ Similarly, we see no merit in defendant's Jencks Act contention. The witness Parodi testified, out of the presence of the jury, that he only spoke briefly to an investigating agent, that the agent took very few notes, and that the witness signed nothing. The district court offered to permit defendant to interrogate the agent, but defendant declined to avail himself of the opportunity. The district court's finding that there was no statement producible under the Act was certainly not clearly erroneous and there was no need for further hearing.

We turn therefore to defendant's remaining contentions.

### III

In regard to the crimes of voluntary and involuntary manslaughter, the district court's charge is set forth in the margin.[4] When the jury, after it had

---

3. After the tragic events of July 16, 1970, defendant was removed from T–3 by means of helicopter, and then only by the unique feat of refueling a helicopter over the Arctic Ocean. At Thule, Greenland, he was transferred to a conventional aircraft which first landed within the United States at Dulles Airport, in the Eastern District of Virginia. 18 U.S.C.A. § 3238 prescribes venue, in such circumstances, in the district into which an offender is first brought, although in a proper case, Rule 21(b), F.R.Crim.P., authorizes a transfer of venue to another district.

4. Manslaughter is the unlawful killing of a human being without malice. The distinction reduced to simplicity, the big distinction between murder in the second degree and manslaughter consists in the existence of malice, express or implied, in one case, and the absence of malice in the other.

Now, there are two kinds of manslaughter.
Voluntary, which means a killing upon a sudden quarrel or in the heat of passion. Involuntary manslaughter, the statutory definition reads, in the commission of an unlawful act not amounting to a felony. In that connection, in the commission of an unlawful act not amounting to a felony, it means doing something and the killing follows, that the doing of the something itself is not a felony, to wit, it isn't a killing in the commission of a felony, such as a robbery or larceny of that type, which is not involuntary, because the law makes it otherwise, so this to be involuntary is in the commission of an unlawful act of some kind less than that which constitutes a felony, and, of course, that includes all unlawful acts that fall in the category of misdemeanors or lesser offenses.

begun its deliberations, asked the district court to redefine manslaughter, the district court granted the request and gave an additional charge set forth below.[5]

We agree with defendant that nowhere in either charge did the district judge tell the jury that they must find, as a necessary element of involuntary manslaughter by the commission of a lawful act without due caution and circumspection, that defendant must be shown to have actual knowledge that his conduct was a threat to the lives of others. In United States v. Pardee, 368 F.2d 368 (4 Cir. 1966), we had occasion to discuss the crime of involuntary manslaughter.[6] After concluding that it requires proof of *gross* negligence, and not simple negligence, we added:

"Gross negligence" is to be defined as exacting proof of a wanton or reckless disregard for human life. *Furthermore, to convict, the slayer must be shown to have had actual knowledge that his conduct was a threat to the lives of others, or to have knowledge of such circumstances as could reasonably be said to have made foreseeable to him the peril to which his acts might subject others.* The reason of the latter comment is that awareness of the tendency to danger, or the foreseeability of injury, from the act or omission is an indispensable element of negligence. Copeland v. State, 154 Tenn. 7, 285 S.W. 565, 49 A.L.R. 605 (1926); State v. Tankersley, 172 N.C. 955, 90 S.E. 781, 783, L.R.A.1917C, 533 (1916). This requirement of proof gains stature when it is recalled that death as a result of an accident, that is an occurrence unpurposed and unattributable to negligence, does not

---

Involuntary manslaughter is also the killing itself or in the commission in an unlawful manner or without due caution and circumspection of a lawful act which might produce death.

Reducing it to the same simpler words but to say the same thing, involuntary manslaughter is the killing of one accidentally, contrary to the intention of the defendant, while in the prosecution of some unlawful but not felonious act or in the unlawful performance of a lawful act accomplished by such carelessness or recklessness on the part of the defendant as is incompatible with the proper regard for human life.

The definition that I gave you or without due caution and circumspection said another way means doing the act grossly or in such a grossly negligent manner.

Gross negligence as here used to constitute lack of caution and circumspection as used in this statute constitutes more than ordinary simple negligence. Gross negligence requires proof beyond a reasonable doubt of a wanton or reckless disregard of human life.

5. Complying with your request I will give it to you briefly, I believe substantially the same as I did it before. I know it will be the same law. It might not be the exact words.

The difference as I told you before between murder, and that is murder in the second degree, or the murder here charged, and manslaughter, consists in the existence of malice, express or implied in one case, and the absence of malice in the other.

The statute defines manslaughter as follows:

Manslaughter is the unlawful killing of a human being without malice, so, obviously, it is the one that is absent malice. It is two kinds. Voluntary, upon a sudden quarrel or heat of passion; involuntary, in the commission of an unlawful act not amounting to a felony, that is, in the commission of a misdemeanor or as distinguished from in the commission of a felony or in the commission of an unlawful, in an unlawful manner or without due cause and circumspection of a lawful act which might produce death.

Now, I went further, lady and gentlemen, in my original charge in describing these two, but that is the statutory definition, and in giving you the same definition in different words, as I told you, and in also a more detailed definition of the heat of passion.

6. United States v. Pardee, supra, was cited to the district court in connection with a request that the court instruct the jury that awareness of an unlawful act was an essential element to establish involuntary manslaughter. The district court distinguished *Pardee* on the ground that it was "an automobile case, a death resulting from reckless driving of an automobile." We disagree that it is inapplicable to alleged involuntary manslaughter by other means.

give rise to civil or criminal liability. (Emphasis added.)

368 F.2d at 374.

■ There can be no doubt that the omission of a charge in accordance with *Pardee* was reversible error in this case. The evidence showed that defendant brandished a gun at the decedent and that the gun fired and killed him. But there was additional uncontroverted evidence from the government's experts that the gun was defective and could be discharged other than by pulling the trigger. Without the instruction, the jury may have convicted on the theory that pointing a gun capable of accidental discharge was an act of gross negligence even though it found that defendant did not discharge it, without consideration of whether defendant knew the gun was defective and thus capable of accidental discharge. If these were its findings, the conclusion of involuntary manslaughter could not follow unless the jury considered and concluded that defendant was aware that the gun was defective. On this ground alone, a new trial is required.

In a second aspect, we conclude that the charge was also defective in that it unduly restricted the jury in its consideration of the special circumstances obtaining on T-3 in its consideration of whether defendant committed an act which constituted gross negligence from which involuntary manslaughter could be found. Defendant requested that the jury be instructed:

> In determining whether or not the defendant is guilty of involuntary manslaughter, the jury must measure his conduct against all of the existing circumstances and determine therefrom whether what he did was in its nature dangerous to life or grossly negligent. Some of the special circumstances you may consider in this case are the location of the alleged act, and its lack of law enforcement and medical facilities and the good character of Mario Escamilla.

This instruction was not given and instead the jury was told, albeit in regard to the question of jurisdiction which was not a jury question, only:

> [A]s I told you in the beginning and again [re]iterate, do not even discuss or consider whether Fletcher's Island had a police force or not, insofar as determining the law, or whether it has laws or not controlling murder, because the Court has told you that this court does have jurisdiction to hear this case, and that the law that I am to give you, that is the law of the United States, is applicable to this case in identically the same manner as it would be applicable to the same crime if it were committed right here in Northern Virginia. So you can just forget the Fletcher's Island part other than for background.

■ This we think was error. Gross negligence or even simple negligence is to be determined by all of the facts and circumstances surrounding an act which is asserted to be either. It would seem plain that what is negligent or grossly negligent conduct in the Eastern District of Virginia may not be negligent or grossly negligent on T-3 when it is remembered that T-3 has no governing authority, no police force, is relatively inaccessible from the rest of the world, lacks medical facilities and the dwellings thereon lack locks—in short, that absent self-restraint on the part of those stationed on T-3 and effectiveness of the group leader, T-3 is a place where no recognized means of law enforcement exist and each man must look to himself for the immediate enforcement of his rights. Certainly, all of these factors are ones which should be considered by a jury given the problem of determining whether defendant was grossly negligent. This is not to say that the standards of civilized conduct and the law of the United States do not prevail even on T-3, but those standards and that law admit of consideration of the circumstances surrounding alleged involuntary manslaughter both in the

continental United States and on T–3. While defendant's request for instruction, particularly the aspect invoking defendant's good character, need not have been granted exactly as requested, the district court should have instructed in accordance with the principle of the request.

■ · We disagree that there is a third defect in the charge. Defendant requested the district court to instruct the jury that "[O]ne may be privileged to threaten another with deadly force under circumstances where the use of such force would be unlawful" including such circumstances as the protection of one's person, property and home, the latter because it "is a sanctuary protected by the law," but the district court rejected the request. Defendant sought to draw a distinction between the *use* of deadly force and the *threat* of deadly force by his request.

The short answer to this contention is that the district court, in accordance with its ruling on requests for instructions before argument, unequivocally told the jury that they could consider defendant's trailer to be his home and "the law does permit a man to use such force that is reasonable and necessary in the mind of an ordinary, reasonable person to expel anyone from his home who is threatening to harm him or is in a position, an apparent position to cause him bodily harm or destroy his property." Further, the court told the jury, the decedent, the group leader, had a right to enter defendant's trailer "so long as he entered at a reasonable time and [under] reasonable circumstances," but that he had no right "to enter a man's house with the apparent intent and to commit any overt act that would put a reasonable person in fear of his life or harm." We perceive this to be a correct statement of the law. It follows, we think, that if told that one may use *actual* force, limited as to extent only by what is reasonable under the circumstances, to protect himself, his home or his property, the jury would understand that one may also use the *threat* of ac-

tual force, including the *threat* of deadly force. Thus, the substance of defendant's request was actually given.

## IV

Although conceding that the district court had the discretion to limit cumulative proof and in particular character witnesses, Michelson v. United States, 335 U.S. 469, 480, 69 S.Ct. 213, 93 L.Ed. 168 (1948), defendant contends that the district court's limiting him to a single character witness and a stipulation (to which he did not agree) that four others would give identical testimony was prejudicial error under the circumstances of this case. In no way departing from the conceded principles, we agree.

Defendant was the only surviving eye witness to his shooting of Lightsey and his testimony was that he did not consciously discharge the gun. There was evidence that the gun would discharge spontaneously. Whether the shooting was accidental depended entirely upon whether defendant was believed; and since the uncontroverted, objective evidence was that the shooting *may* have been accidental, defendant's credibility and his reputation for truth and veracity were of even greater significance in this case than in many others where a defendant seeks to exculpate himself.

When defendant moved to transfer his case to the Central District of California, one of the grounds assigned in support of the motion was that "[t]he presentation of character witnesses in this case also promises to be crucial" and that character witnesses could more readily and conveniently be obtained in the Central District of California. The motion was denied, and then at a subsequent pretrial conference, the district court, properly within its discretion, indicated that defendant would be limited to the presentation of the testimony of only five character witnesses.

■ At trial, defendant had his five character witnesses from California available. The first was called and testified that, knowing defendant as a

friend and neighbor and as an associate at General Motors Defense Research Laboratory and knowing the people who knew defendant, defendant's reputation for honesty and veracity was excellent and his reputation for being a peaceful, non-violent person was very, very good. Before the next character witness was called, the government offered to stipulate to defendant's "general reputation for truth and veracity and also whatever the other one was." Counsel for defendant replied, "we would like to present these witnesses; they have traveled here from California to testify," but then the court, amending the government's offer, said that "[i]f the Government concedes that these other witnesses would say identically the same thing, no use to have them say it." The government readily concurred in the amendment; and without agreement from defendant, the jury was told that "these other five people, from California or from places where they generally live, would testify identically" that defendant's reputation for truth and veracity and for peace and being a man of non-violence was excellent. Defendant's request that the witnesses be presented to the jury was denied and the witnesses, except one, were excused.

We think that if the district court concluded to limit the number of character witnesses as it did at the pretrial conference, the ruling should not have been departed from except for good cause. The record reflects no such cause. The witnesses had come from California at considerable expense, and the first witness testified very briefly and was not cross-examined. Predictably, the others could all have testified without unduly prolonging the trial. In any event, if the number were to be further limited, defendant should have been so advised before the limitation was put into effect. No doubt, in defendant's estimation, there were degrees of persuasiveness among his proposed character witnesses and simple fairness would require that if he was to be limited to presenting only one, he should have the opportunity to select that one from among the group rather than to have the limitation imposed after the first, who may not have been defendant's first choice if he could choose but one, had testified. Moreover, we think it was an undue and unnecessary limitation upon defendant for the identity of character witnesses whose testimony was stipulated to be withheld from the jury. We therefore conclude that, under the special circumstances which existed here, the district court abused its discretion in limiting character witnesses in the manner described.

For all of these reasons, the judgment of conviction must be set aside and a new trial awarded.

Reversed and remanded.