STATE of Missouri, Respondent,

v.

Barbara BEACH, Appellant.

No. 47444.

Supreme Court of Missouri,

Division No. 2.

Dec. 14, 1959.

Green & Green, West Plains, for appellant.

John M. Dalton, Atty. Gen., Paul N. Chitwood, Asst. Atty. Gen., for respondent.

LEEDY, Presiding Judge.

James Beach and his wife, Barbara, were informed against in the Howell Circuit Court for the offense of manslaughter allegedly committed by culpable negligence in having failed, neglected and refused "to provide adequate food, nourishment and medical attention" to their minor child, Gary William Beach, an infant of the age of six weeks. Upon a trial they were convicted and the punishment of each was fixed by the jury at six months in jail. They filed a joint motion for a new trial, which was sustained as to the husband, but with respect to the wife the court did not pass thereon within 90 days after the date of its filing, so that as to her the motion was overruled by operation of law. 42 V.A. M.S. Supreme Court Rules, Rule 27.20. She was accorded allocution, and duly sentenced in accordance with the verdict, and she appeals.

The appeal is here on a full transcript, but appellant has filed no brief. The view we -take of the case makes it unnecessary to consider or rule any question raised by the motion for new trial except that of the sufficiency of the evidence to support the verdict. Consequently, the sufficiency of the information, and the applicability of the statute upon which it is based (§ 559.- 070, RSMo 1949 and V.A.M.S.) will be assumed. The culpably negligent omissions charged were not attempted to be proved by direct evidence, but the state's reliance in that regard is wholly upon circumstantial evidence, i. e., the physical condition of the child at the time of its death, as described and interpreted by Dr. Jack Wiles, a physician (M.D.) residing at West Plains. Dr. Wiles was the only state's witness whose testimony went to the merits of the case as

distinguished from mere formal proofs, not here relevant, and hence the question of the sufficiency of the evidence is determinable upon an examination of his testimony, there being nothing in appellant's proofs which aided the state's case. Preliminary to considering this single point, it should be said that it appears that appellant was 25 years of age at the time of trial; her husband, 37. They had been married five years, and were the parents of three other children, two of whom lived with grandparents. The husband was a laborer, a trash hauler. Appellant had formerly worked at a rest home, and at the time in question she and her husband were keeping four aged and infirm persons in their home (two bedfast), from each of whom they received $60 per month. So much for background of the principals.

Dr. Wiles had delivered the baby on February 19, 1958, and attended it professionally at its death six weeks later, on April 1, 1958. He had directed appellant to bring the child back to him for a checkup at six weeks of age ("or sooner, if she had any difficulty," according to his recollection), so that the date of the child's death was one day short of the expiration of that period. Dr. Wiles testified that when, on April 1, 1958, he arrived at the Beach home in response to appellant's call, he found the baby dying; the eyes were rolled back and set, the respiration was quite laboring and very slow, the heartbeat was slow, the pupils did not react to light; and the child was extremely emaciated and thin, and the lower part of its body, "most markedly over the left hip, leg and thigh" were covered with sores. The witness was then asked by the prosecutor to state "as to what the child was suffering from," and the witness answered, "Malnutrition and from diaper rash severe and as to exact cause as to what it was being in such an extreme poor condition I was unable to determine." The child died within the next thirty or forty-five minutes. Meanwhile he "gave the child ¼ cc Susphrine which is a stimulant," and after waiting five or ten minutes, "repeated

that." The doctor was asked to tell the jury what, in his opinion, was the primary cause of the child's death, or the primary reason for its death, to which he answered, "The primary reason I couldn't determine. The contributory reason I could determine." His examination continued, in pertinent part, thus:

"Q. What were the contributory reasons? A. The malnutrition and poor physical condition of the child.

"Q. Would you say whether or not the lack of medical care was the contributory factor in the death of the child? A. In my opinion it was.

\* \* \* \* \* \*

"Q. Could you explain to the jury the difference between the immediate cause of death and the contributory cause of death? A. Probably I could best do that by illustration, for instance someone might be in an automobile accident and he dies of shock, the shock is the immediate cause of death which could be due to a skull fracture and it was due to the automobile accident. Medically speaking he died of shock with a contributory cause.

"Q. Then you say the contributory cause of this baby's death was malnutrition and lack of medical care? A. It was in my opinion.

"Q. You couldn't say the immediate cause? A. Not with any degree of positivity."

### Cross-Examination

"Q. Now what do you mean, Doctor, by an undernourished child? Do you mean it hadn't had anything to eat or wasn't absorbing things into the body? A. It could be either.

\* \* \* \* \* \*

"Q. Can you tell the jury positive before then the reason this child was slender was that it hadn't had anything

to eat? A. No, sir, I couldn't state that positively.

"Q. You say the sores on the child you saw were from a diaper rash? A. In my opinion they were.

\* \* \* \* \* \*

"Q. Does that have a tendency to get over the body? A. It does.

"Q. You would diagnose these places you saw as from a diaper rash? A. In my opinion they were.

\* \* \* \* \* \*

"Q. Did you notice any gasping of the child after you gave the medicine? A. Yes, sir, it was gasping before it was given.

"Q. It was suffering from convulsion? A. I don't know.

"Q. You testified you thought it was. A. That is a possibility.

"Q. Would a convulsion kill the child? A. No, sir.

\* \* \* \* \* \*

"Q. Diaper rash wouldn't kill the child would it, Doctor? A. Not to my knowledge.

"Q. Convulsion didn't kill the child? A. It is possible.

"Q. It is? A. Yes, sir.

"Q. By strangulation? A. By strangulation or other difficulties.

"Q. If lack of food for the child brought on its condition \* \* \* would that mean it hadn't had anything to eat or very little food a day? What I am trying to say, Doctor, would two or three bottles a day keep a child in fair condition of these four ounce bottles three or four feeds a day? A. Ordinarily that would be inadequate.

"Q. Would that cause the condition in which you saw the child? A. It would be contributing to the condition.

"Q. This sickly condition? A. In my opinion it would.

"Q. How much a feed would be required to keep a child healthy? A. That varies markedly with different individual children.

\* \* \* \* \* \*

"Q. Doctor, is it possible for a small child, such as this, to suffer from a liver or kidney condition? A. Certainly.

"Q. That could be told by post-mortem examination? A. True.

"Q. None was performed? A. None to my knowledge.

"Q. Can you tell the jury positively this child died by lack of food not given to the child by the parents? A. I cannot state that was the primary cause of death.

"Q. Can you state it was the secondary cause that the parents failed to feed the child food? A. In my opinion that was a contributing cause.

"Q. How can you determine they didn't give the child food? A. I can only determine that by the physical condition of the child when I saw it.

"Q. That same condition could have existed if the child was injured in delivery, if that had been the case? A. Ordinarily not.

\* \* \* \* \* \*

"Q. Would a liver infection affect it in that manner? A. It would be possible.

"Q. Would a kidney infection affect it in that manner? A. Ordinarily not.

\* \* \* \* \* \*

"Q. Doctor, I will ask you if it isn't a fact with children sometimes by reason of the physical condition the amount of food they take fails to put on any weight? A. That is possible.

716

"Q. Therefore all you can tell the jury is that you saw this child in an undernourished condition? A. I did.

"Q. You don't know, or can you tell the jury of your own positive knowledge or from the examination of this child that these defendants were the cause and brought about that condition by failing to feed this baby? A. I cannot state that positively, no."

### Redirect Examination

"Q. Mr. Green asked you if that condition was brought about by failing to feed the baby; was it brought about by failure to feed the baby properly? A. In my opinion it was.

"Q. Was the physical condition of the baby, in your opinion, at the time you saw it, did that occur just within an hour's time or three hours' time? A. In my opinion that did not.

\* \* \* \* \* \*

"Q. It was something that progressed with time and the baby was in a state of death? A. Yes, sir."

### Further Cross-Examination

"Q. I believe you told Mr. Moore you didn't mean the baby was not fed but wasn't fed enough, is that what you mean? A. All I could state from that would be from my physical examination that the baby was markedly thin and had all appearances of being markedly malnourished.

"Q. Or had a disease of some kind? A. That is a question.

\* \* \* \* \* \*

"Q. Couldn't this child have died and been in that condition by some physical condition not brought about by lack of food? A. It is possible."

### Redirect Examination

"Q. Doctor, as a matter of fact, it is possible for one hundred different things to have been wrong with the baby? A. That is quite true.

"Q. I am asking you, in your opinion, from your own medical judgment the child was suffering from malnutrition and medical care? A. It was, in my opinion."

### Further Cross-Examination

"Q. The child can suffer from malnutrition even though it has been given adequate food? A. Not if fed adequate food.

"Q. Do you mean enough or proper? A. Proper food.

"Q. What would be proper food, apples and dumplings or milk? A. That would vary with children.

"Q. What could they have fed it besides milk? A. There are varieties of milk.

"Q. If these folks fed milk, you are telling the jury it died because it didn't have the proper kind of food, is that right? A. No, sir."

It will be seen that neither the primary nor the immediate cause of the child's death was shown. On the contrary, it affirmatively appears they were not determined by the witness. How, then, can it be said that such death resulted from a claimed culpably negligent omission on appellant's part in failing to provide food? Admittedly, the conditions described by the physician were only contributory or secondary causes, and there is nothing in the record from which it may reasonably be inferred that in the absence of such contributory or secondary causes death would not have ensued, and hence nothing to make them, or either of them, causes contributing proximately to the child's death. As regards failure to provide medical attention, the rule is that "it must appear that the decedent's death was imputable to such failure, or, at least, that life might have been prolonged if proper medical attention had

been provided." 26 Am.Jur., Homicide, § 208. On this issue the evidence is limited to the doctor's opinion that lack of medical care was merely a contributory factor in the death. Consequently, we must hold the evidence as excerpted above insufficient to make it a question for the jury as to whether the child's death resulted from the culpable negligence of defendant in any of the respects charged.

Perhaps the case should be decided on the foregoing considerations alone, but there is another insurmountable obstacle to the submissibility of the case on the showing made, and that is the want of proof of culpable negligence. In State v. Studebaker, 334 Mo. 471, 480, 66 S.W.2d 877, 881, it was said:

"But it is evident a person ought not to be held responsible criminally for any and every negligent act that would subject him to civil liability for damages. Mere inattention or mistaken judgment resulting even in the death of another is not criminal unless the quality of the act makes it so. On the other hand, it is said carelessness may be so gross and wanton as to import malice in which case the homicidal act would be murder. * * * The extent to which the negligent act obviously imperils the life of another measures the state of mind of the doer in legal contemplation and therefore his criminality. * * *

"In the zone between these two extremes—misadventure or mere civil liability, on the one hand, and carelessness so gross and wanton as to import malice, on the other, the killing of a human being by culpable negligence is manslaughter. The fundamental requirement fixing criminal responsibility is knowledge, actual or imputed, that the act of the slayer tended to endanger life. 13 R.C.L. § 161, p. 859. Or, as is said in 29 C.J. § 141, p. 1154, 'It must be shown that a homicide was not improbable under the facts as existed which should have influenced the conduct of accused.' The rule is summed up in this way in State v. Tankersley, 172 N.C. 955, 90 S.E. 781, 782, L.R.A.1917C, 533, 535:

" 'The decisions of the courts have described in different terms the kind of negligence required to constitute crime. In some of them it is said to be negligence that is "culpable and gross." In others, that it must be such as to show a reckless disregard of the safety of others, etc.; but all of the authorities are agreed that, in order to hold one a criminal, there must be a higher degree of negligence than is required to establish negligent default on a mere civil issue, and that, in order to a conviction of involuntary manslaughter, attributable to a negligent omission of duty, when engaged in a lawful act, it must be shown that a homicide was not improbable under all the facts existent at the time and which should reasonably have an influence and effect on the conduct of the person charged.' "

And it was further said in State v. Melton, 326 Mo. 962, 964, 33 S.W.2d 894, 895: "To make negligent conduct culpable or criminal and make it manslaughter, the particular negligent conduct of the defendant must have been of such a reckless or wanton character as to indicate on his part utter indifference to the life of another who is killed as a result thereof."

We do not think the fact that the child was undernourished and suffering from diaper rash at the time of its death, under the showing made by the state, can reasonably be said to bespeak or show, circumstantially, negligence on appellant's part of such character as to evince a wanton or reckless disregard for, or utter indifference on her part to human life or bodily safety. It occurs to us that under the most favorable view to the state, its proof extended no further than to show ordinary negligence— not culpable negligence within the meaning of the manslaughter statute, supra.

Inasmuch as it does not appear that the state might produce additional evidence on another trial, the judgment will, for the reasons above stated, be reversed and the defendant discharged. It is so ordered.

All concur.