**STATE of Missouri, Respondent,**

v.

**Karen L. RIGGS, Appellant.**

**No. WD 55763.**

Missouri Court of Appeals, Western District.

Oct. 5, 1999.

Craig A. Johnston, Asst. Public Defender, Columbia, for Appellant.

Philip M. Koppe, Kansas City, for Respondent.

Before: Presiding Judge LAURA DENVIR STITH, Judge LOWENSTEIN and Judge RIEDERER.

LOWENSTEIN, Judge.

Defendant Karen L. Riggs was convicted by a jury of the felonies of involuntary manslaughter, § 565.024, RSMo 1994, and endangering the welfare of a child, § 568.045, RSMo 1994 (all further statutory references are to the Revised Statutes of Missouri, 1994, unless otherwise indicated). Riggs was sentenced to concurrent terms of five years imprisonment. The convictions resulted from an incident involving Riggs' two-year-old child Benjamin (Ben) who, while unattended by her for some forty-five minutes, wandered away from his home and drowned in a pond. On appeal, Riggs contends (1) there was insufficient evidence to support a guilty verdict on the involuntary manslaughter count; (2) there was insufficient evidence to support a guilty verdict on the count of endangerment of a child; and (3) the trial court erred in overruling her objections to vague and ambiguous jury instructions.

## FACTS

Riggs, her three young children, and her boyfriend, Christopher McMillan, resided at the Goodwill Chapel Trailer Park outside Sedalia. Their landlord, Sherry Woolery, lived in one of fifteen mobile homes that were situated side by side in the trailer park. They were arranged so that home No. 0 was closest to Woolery's home, and home No. 14 was at the opposite end of the park. When Woolery rented home No. 8 to Riggs she mentioned there were some rules and regulations she and the children were to follow. Specifically, the children were not allowed past home No. 1 because there was an open basement and an unfenced duck pond located about 80 feet behind Woolery's home. The distance between the Riggs' mobile home and the pond was approximately 628 feet.

Ida Anderson lived in home No. 5 on July 22, 1997. Anderson testified she was in her home on that day and heard Riggs' four-year-old son, Jason, yelling and screaming. Anderson went outside and Jason told her that his brother Ben was "up in the pond." Anderson told Jason to go home and started running toward the pond, enlisting the help of a neighbor, Chip Robinson. She stopped to call 911. Robinson testified that he reached the pond first and saw Ben lying face up in two and a half to three feet of water. Robinson pulled Ben out of the pond and attempted to perform CPR. Meanwhile, several people had congregated around the pond, including Riggs and McMillan. According to Robinson's testimony, Riggs looked concerned, upset and was crying. Within a short time an ambulance arrived and paramedics also attempted CPR. Ben was transported to a nearby hospital where he was pronounced dead.

Officer David Keller from the Pettis County Sheriff's Department had arrived at the scene while the paramedics were already performing CPR on Ben. Keller then briefly spoke with Riggs about the incident. Riggs stated that she and McMillan had gone to town that morning, returned around noon, and Jason, age four, and Ben, age two, went outside to play. After the boys played for about forty-five minutes, Jason came in and said something about Ben being in the water. Jason told Keller that Ben had run into the water after some baby ducks. Keller elected not to then take a statement from Riggs due to her emotional state. Since she was extremely upset, Keller felt it would be better to wait at least until the next day to take the report.

At trial, McMillan testified for the defense regarding the events that took place on the fateful day. He testified that he, Riggs, and her children returned home around noon that day from a trip to Sedalia. Riggs made sandwiches for the three children and herself. While she made the sandwiches, McMillan began to watch a movie. Ben and Jason ate their sandwiches outside on the steps. Later, Jason came in for a glass of water, and at this time, Ben was standing at the front door where Riggs could have possibly seen him. According to Riggs, she later got up to check on the boys and they were still on the steps.

Shortly thereafter, Jason was screaming, but Riggs and McMillan could only hear the words "Ben" and "water." Riggs ran outside to look around the trailer and after noticing everyone running toward the duck pond, Riggs and McMillan followed. When they arrived at the pond, Robinson was trying to perform CPR on Ben. Riggs' emotional state at the time was described as "hysterical."

### STANDARD OF REVIEW

In Missouri criminal cases tried to a jury, the function of an appellate court is as follows:

> It is not the role of a reviewing court to weigh the evidence, but rather, it is the function of the jury to determine beyond a reasonable doubt whether defendant was guilty of the offense charged…In assessing the sufficiency of the evidence, we must accept as true all evidence and inferences that tend to support the verdict and disregard all evidence and inferences to the contrary. The question is whether the evidence, viewed in a light most favorable to the State, is sufficient to support the verdict.

*State v. Brown,* 660 S.W.2d 694, 698 (Mo. banc 1983) (cases cited therein).

### ANALYSIS

### I. INVOLUNTARY MANSLAUGHTER

As her first point, Riggs argues the evidence was insufficient to support her conviction of involuntary manslaughter under § 565.024.

A person commits the crime of involuntary manslaughter under § 565.024.1(1) if he or she "[r]ecklessly causes the death of another person." A person acts "recklessly" when he or she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.016.4.

The appropriate verdict director, MAI–CR3d 313.10, told the jury if it found the death of Ben was caused "... by failing to provide proper adult supervision, allowing Benjamin Riggs to wander away from his home and drown in a pond, and second, that defendant recklessly caused the death ...," then Riggs was guilty of involuntary manslaughter. The jury was instructed that in determining whether Riggs "recklessly caused the death of Benjamin Riggs, you are instructed that a person acts recklessly as to causing the death of another person when there is a substantial and unjustifiable risk she will cause death and she consciously disregards that risk, and such disregard is a gross deviation from what a reasonable person would do in the circumstances."

The function of this court is to determine as a matter of law whether the evidence required for a finding of criminal recklessness existed in sufficient quantity so that any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989); *State v. Palmer,* 822 S.W.2d 536, 537 (Mo. App.1992).

Riggs contends the state presented insufficient evidence to prove the culpable mental state of recklessness. The question for the court is whether Riggs' conduct constituted recklessness pursuant to § 565.024.

Caselaw has held that "[t]o make negligent conduct culpable or criminal and make it manslaughter, the particular negligent conduct of the defendant must have been of such a reckless or wanton character as to indicate on his part *utter indifference* to the life of another who is killed as a result thereof." *State v. Melton*, 326 Mo. 962, 33 S.W.2d 894, 895 (1930). (Defendant's manslaughter conviction was reversed after fatally injuring a pedestrian when he drove his automobile at 20 miles an hour on highway and struck the pedestrian when he was blinded by lights shining on the windshield of defendant's automobile.)

The facts in the instant case involve not an affirmative act by a parent, but the failure of a parent to take certain action, in other words an omission. Specifically, this case involves the failure of Appellant to provide proper adult supervision for her son, resulting in his untimely death.

■ Although not raised by the parties, it would appear that a duty to act must be found before an involuntary manslaughter conviction based on an *omission* may be had.[1] Missouri's involuntary manslaughter statute is not defined in terms of failure to act.[2] § 562.011, which defines "voluntary act," reads, "(4) a person is not guilty of an offense based solely upon an omission to perform an act unless the law defining the offense expressly so provides, or a duty to perform the omitted act is otherwise imposed by law." Since Missouri's manslaughter statute does not expressly provide for violation based solely on omission, a duty to act must be found elsewhere.[3]

Under the English common law, recognized as far back as Blackstone's Commentaries, it is known that parents have certain duties to their children. It is found in the English common law that parents have the duty to maintain, protect and educate their children. 1 Bl. Com. 434. By statute, Missouri has adopted the English common law as its own. § 1.010. Therefore, a duty existed on the part of Appellant to protect her child. In other words, there was a duty imposed by law sufficient to meet the requirements of § 562.011 for purposes of the involuntary manslaughter statute. Once it is established that a duty to act did in fact exist, the actual omission involved may be analyzed.

The facts now before the court are unique in a case where the defendant has been convicted of involuntary manslaughter based on the negligent or reckless negligence of the defendant to take precautions. Cases here, and in other jurisdictions that have upheld manslaughter charges are much more severe and the facts can clearly be distinguished from the case at issue here.

In Missouri, the most factually similar case to the one before this court is *State v. Mahurin*, 799 S.W.2d 840 (Mo.1990), cert. denied 502 U.S. 825, 112 S.Ct. 90, 116 L.Ed.2d 62 (1991), in which parents failed to properly feed their two-month-old twin boys resulting in death of one of the children. The Mahurins had been given instructions by health care professionals on proper infant care upon discharge from

---

**1.** The court notes there is caselaw in which conviction for "omission" involuntary manslaughter has been reversed based upon failure to instruct the jury that they must find defendant was under a legal duty to act. See *Jones v. United States*, 308 F.2d 307 (1962). However, as noted, this challenge was not raised by the parties either at trial or on appeal.

**2.** To reiterate, § 565.024 reads, "A person commits the crime of involuntary manslaughter if he: (1) Recklessly causes the death of another person." § 562.016 reads, "A person

'acts recklessly' or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

**3.** See *Commonwealth v. Welansky*, 316 Mass. 383, 55 N.E.2d 902 (1944), for a duty of a building owner, and *Commonwealth v. Kellam*, 719 A.2d 792 (Pa.Super.1998), for a duty of a non-parent, live-in person to a child.

the hospital. *Id.* at 844. The receipt of those instructions led the Court to find the Mahurins *consciously disregarded* a risk to their child when they failed to properly feed him and they were found to have acted recklessly. *Id.* The state declares the disregard of instructions in *Mahurin* is analogous to the present case in which Appellant failed to provide supervision for her child after having been instructed by Woolery, her landlord, that children were not allowed past home No. 1 because of the unfenced duck pond.

However, the giving of the instruction/warning in *Mahurin* was not the only fact which led the Court to make a finding of recklessness. In that case, the infant was losing weight over a period of time and the mother admitted to knowing this. *Id.* The Supreme Court of Missouri found the physical appearance of the child should have alerted the parents as to the "grave condition" of the child. *Id.* The Court found the *combination* of the childcare instructions given to the Mahurins *coupled with* the physical appearance of the infant warranted a finding of recklessness sufficient for involuntary manslaughter. This is a far different situation from the one presented here. Of course, a parent whose child is deteriorating to the point of starvation before their very eyes should be aware of the danger the child faces. Failing to seek treatment for a child in such a state is blatantly reckless. Such an omission in the face of obvious physical warnings, coupled with failure to heed a medical professional's instructions is too far removed from failure to follow a landlord's instructions to be analogous. Due to this distinction, *Mahurin* is not controlling in the instant case.

The reasoning in another Missouri case seems more appropriate. In *State v. Beach*, 329 S.W.2d 712 (Mo.1959), a manslaughter conviction was reversed against mother-defendant for the death of her six-week-old infant. The Supreme Court found the evidence was insufficient to present a question for the jury as to whether the child's death resulted from culpable negligence of the defendant by failing to provide food, nourishment, and medical attention. *Id.* At the time of death, the child was found suffering from severe diaper rash covering its entire body and malnutrition. The condition of the child was described as "the eyes were rolled back and set ... the heartbeat was slow ... the child was extremely emaciated and thin, and the lower part of its body ... [was] covered with sores." *Id.* at 714. The doctor-witness never gave a primary or immediate cause for the child's death, so recklessness could not be presented to the jury for determination.

*Beach* went on to cite *State v. Studebaker*, 334 Mo. 471, 66 S.W.2d 877, 881, which held that "[m]ere inattention or mistaken judgment resulting even in the death of another is not criminal unless the quality of the act makes it so." The *Beach* court held that the defendant's conduct did not rise to a level of culpable negligence within the meaning of the manslaughter statute, but rather "extended no further than to show ordinary negligence." *Beach*, 329 S.W.2d at 717. "[A]ll of the authorities are agreed that, in order to hold one a criminal, there must be a higher degree of negligence than is required to establish negligent default on a mere civil issue" and in order to convict one of involuntary manslaughter "it must be shown that a homicide was not improbable under all the facts existent at the time...." *Studebaker*, 66 S.W.2d at 881.

In addition, based on more severe acts of the defendant than in the case at bar, courts in other states have reversed convictions of involuntary manslaughter. *See e.g., People v. Weeks*, 115 Ill.App.3d 524, 71 Ill.Dec. 472, 450 N.E.2d 1351 (1983), (Twenty-year-old mother's conviction of involuntary manslaughter who gave birth on bathroom floor and then threw it in garbage reversed as defendant was physically incapable of further assisting the child at the time of its death.); *People v. Spani*, 46 Ill.App.3d 777, 5 Ill.Dec. 238, 361 N.E.2d 377 (1977), (Defendant's involuntary manslaughter conviction was reversed as resulting death was found to be an accident where a pistol went off when it was placed

on a counter and fatally shot victim; death was found to be unintentional, and even though caused by reckless conduct, an act committed accidentally does not involve a mental state cognizable to the criminal offense of involuntary manslaughter.)

In comparison, several cases involving more severe facts have also been affirmed. *See e.g., State v. Miller*, 981 S.W.2d 623, (Mo.App. W.D.1998), (Defendant was charged with involuntary manslaughter when he placed a loaded shotgun in his lap knowing that the safety mechanisms were off while a man was hitting him in the head through his car window); *State v. Frappier*, 941 S.W.2d 859 (Mo.App. S.D. 1997), (Defendant's conviction of involuntary manslaughter was affirmed where defendant had picked his crying three month old child up by the neck, shook him, and threw him down.)

The Appellant cited *People v. Lansing Terrace Apartments, Inc.*, 70 Misc.2d 44, 332 N.Y.S.2d 705 (1972), (Maintenance man's indictments were dismissed after he was charged with reckless endangerment arising out of the drowning of three children in a pool surrounded by a fence from which boards were allegedly missing,) where the court stated that "[m]ere lack of foresight, stupidity, irresponsibility, thoughtlessness, ordinary carelessness, however serious the consequences may happen to be, do not constitute culpable negligence."

■ Riggs' conduct included nothing intentional. She did not commit overt acts that would blatantly harm a child. Her omission to watch her children on the steps of her home for a forty-five minute period did not make it substantially certain that her two-year-old son would wander to his death. The pond was 628 feet away from her home with more than 8 homes between Riggs' home and the pond.

The above-cited cases involve facts in which the defendants either acted or omitted to act in extreme measures. Violently shaking a baby or starving a child to death are acts that have constituted reckless conduct and are clearly distinguishable from the facts here. Leaving children on the steps to one's house to eat a sandwich for forty-five minutes is far less severe than leaving a dead child in a garbage can. Accordingly, the appellant's omission to watch her child was not reckless conduct to such an extreme that it rises to the level required to be liable for homicide. This point is sustained and the involuntary manslaughter conviction will be reversed.

## II. CHILD ENDANGERMENT

On her second point of appeal, Riggs claims the evidence was insufficient to support her conviction of endangering the welfare of a child in the first degree. Under § 568.045.1, a person commits the offense of endangering the welfare of a child if he or she "knowingly acts in a manner that creates a substantial risk to the life, body or health of a child less than seventeen years old." Under § 562.016.3, as relevant to this case, a person acts knowingly "(1) with respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or (2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result."

Riggs first argues the state failed to prove that leaving her son Ben without proper supervision for forty-five minutes created a "substantial risk" to her son's life. Second, Riggs contends she did not "knowingly" act in a manner that created a substantial risk to the life, body, or health of her two-year-old son. Riggs asserts she had no way of being "practically certain" that leaving her son alone would result in his death. The court finds no merit to these arguments.

First, it is clear to this court that Riggs' actions here created a substantial risk to two-year-old Ben. Leaving a child outside for a period up to forty-five minutes, without proper supervision, with an unfenced duck pond nearby, puts that child at risk.

■ Second, Riggs claims she did not act "knowingly" in that she had no way of being "practically certain" that leaving

Ben without proper supervision would result in his death. In making this argument, appellant mistakenly melds together the two charges of involuntary manslaughter and child endangerment. Under § 568.045 a person commits child endangerment if she knowingly acts in a manner that creates a substantial risk to a child. Section 562.016.3 defines acting "knowingly" as being aware that conduct is "practically certain to cause that result." Reading the statutes together, the state need not prove Riggs was practically certain that Ben's *death* would occur as a result of her failure to provide supervision. Rather, for a charge of child endangerment, the state must prove Riggs knew her failure to provide proper supervision for her two-year-old child for some forty-five minutes was practically certain to *endanger* the child. Whether the outcome of this incident had been Ben's death, rescue from the water or his return home before ever reaching the pond, a charge of child endangerment could have been filed and the question would remain the same. That is, the question before the jury would be whether or not Riggs knowingly put the child in a position of substantial risk by her conduct.

This issue boils down to a determination as to whether there was evidence from which reasonable persons could have found the accused guilty of this charge. *State v. Mishler*, 908 S.W.2d 888, 891 (Mo. App.1995). The mental elements of the defendant's knowledge may be proved by direct evidence and reasonable inferences drawn from the circumstances surrounding the incident. *State v. Abercrombie*, 694 S.W.2d 268, 271 (Mo.App.1985).

In *State v. Mahurin, supra*, 799 S.W.2d at 842–4, parents were also charged with second-degree endangerment, § 568.050, for failing to feed their twins (one child died of starvation, the other was suffering from malnutrition). The evidence showed the parents had been given instruction on feeding and infant care and should have been aware of the risk and of the grave condition of the infants who were "skin and bones" when discovered. In *State v. Gaver*, 944 S.W.2d 273, 277–8 (Mo.App. 1997), Division of Family Service workers had advised mother that her children had suffered extensive injuries at the hands of her husband, but she did nothing to stop continued injuries. Relying on *Mahurin*, the court affirmed the conviction of endangerment writing that the defendant acknowledged the warnings but "essentially argued" she still did not "knowingly commit these offenses." Without recounting the facts here, a reasonable juror could have found that leaving a two-year-old child outside for forty-five minutes, coupled with a warning from the trailer park manager about the unfenced duck pond, put that child at risk, and defendant by her inaction knowingly endangered her child. The point is denied.

### III. JURY INSTRUCTIONS

On her final point, Riggs claims the trial court erred when it overruled her objections to instructions for involuntary manslaughter and child endangerment. Riggs asserts the instructions were not supported by any evidence and the phrase "proper adult supervision" used in both instructions allowed a "roving commission to the jury" because there were no guidelines or standards as to the meaning of the phrase. Because of the ruling on the judgment for involuntary manslaughter, only the portion of this point pertaining to child endangerment is pertinent.

Riggs' argument that the jury could not understand the plain meaning of the language "proper adult supervision" is without merit. The verdict director in question covered all essential elements of the crime charged and required the jury to find each of these elements. The instruction fully complied with the applicable MAI. Therefore, the giving of the instruction was proper. *State v. Shirley*, 657 S.W.2d 686, 688 (Mo.App.1983). This point is denied.

\* \* \*

Because of the similarity between the crimes of involuntary manslaughter and

endangerment when the victim is a child, two additional matters will be mentioned:

1) Riggs has not raised, and the court need not decide, a double jeopardy issue based on the convictions and sentences under both the child endangerment and manslaughter statute. *See e.g., Commonwealth v. Barnhart*, 345 Pa.Super. 10, 497 A.2d 616 (1985) holding that a violation of the constitutional bar against double jeopardy occurred by sentencing the appellant for both involuntary manslaughter and child endangerment convictions because "a finding that the accused knowingly endangered the welfare of a child is sufficient to establish intent under (the manslaughter statute)," resulting in two sentences for the same act. Missouri courts have held that "[t]he double jeopardy clause protects defendants from multiple punishments that the General Assembly did not intend," *State v. Elliott*, 987 S.W.2d 418 (Mo.App. 1999), citing, *State v. McTush*, 827 S.W.2d 184, 186 (Mo. Banc 1992), and "[t]he protection against cumulative punishments for the same offense 'is designed to ensure that the sentencing discretion of the courts is confined to the limits established by the legislature'." *Id.* quoting *Ohio v. Johnson*, 467 U.S. 493, 104 S.Ct. 2536, 81 L.Ed.2d 425, (1984). Further, Missouri courts have held that the claim of double jeopardy is a personal right and if defendant fails to raise it at trial, the claim is waived. *See Estate of Abbott*, 944 S.W.2d 279 (Mo.App. 1997) citing, *State v. Baker*, 850 S.W.2d 944, 947 (Mo.App.1993) quoting *State v. Miner*, 748 S.W.2d 692, 693 (Mo.App.1988).

For an in depth discussion of double jeopardy analysis and the implications of failure to raise such a claim, see *Bass v. State*, 950 S.W.2d 940, 944–46 (Mo.App.1997).

2) Even if there is no double jeopardy issue inherent in dual convictions for involuntary manslaughter and child endangerment, a question remains, how can a court uphold a conviction of endangerment and still reverse a conviction for involuntary manslaughter? Inattention or nonaction, particularly with the care of children is rarely sufficient to raise the crime from endangerment to homicide, because the resulting death is not so certain. Violently shaking a newborn can surely result in death. Even the following examples of non-action negligence fact patterns resulting in the death of a child can be clearly equated into a certain death; the failure to feed will ultimately result in death, the decision to not seek medical attention for a ruptured appendix will lead to an almost certain death. Child endangerment statutes, like Missouri's, which provide criminal penalties for acting "... in a manner that creates a substantial risk to the life, body or health of a child of less than seventeen years old ...", almost always provide the most effective mechanism by which the state can protect children and punish those who hurt them, or allow them to be hurt. Utilization of homicide prosecutions should normally be left for those factual situations where the conduct or lack of supervision of the defendant is more culpable or egregious than in this case.[4]

This court does not endorse nor approve the inattention, the negligence of the de-

---

4. Earlier versions of our involuntary manslaughter statute used the term "culpable negligence" in describing the conduct prohibited. As stated earlier, present Missouri statutory law refers to "recklessly" causing a death, and the mandatory instruction states a person acts recklessly when there is a substantial and unjustifiable risk the defendant will cause death and the person consciously disregards that risk and such disregard is a "gross deviation" from what a reasonable person would do in the circumstances. Despite the different statutory wording, many of the older cases written under the aegis of the culpable negligence language, are appropriate for the examination of the type of negligence in a fact pattern now decried in the present involuntary homicide statute, Section 565.024. One earlier case states that negligence to be criminal must be "... something more than ordinary, commonlaw or actionable negligence". *State v. Schneiders*, 345 Mo. 899, 137 S.W.2d 439 (1940). "To make negligent conduct culpable or criminal and make it manslaughter, the particular negligent conduct of the defen-

fendant-mother, but this court cannot say the facts and circumstances here are sufficient to establish gross negligence, or show a conscious disregard for human life, a reckless disregard for the consequences of her action that elevate the crime here from neglect to involuntary manslaughter. *State v. Schneiders, supra,* 137 S.W.2d at 440; *State v. Melton, supra,* 33 S.W.2d at 895; *State v. Beach, supra,* 329 S.W.2d at 717; See also *State v. Torres,* 495 N.W.2d 678, 682 (Iowa, 1993). This is not to say, for example, that had the pond been closer, the time of the mother's torpor been longer, such facts may have been such to have constituted an "utter indifference" to the life of her child, *State v. Melton,* supra 33 S.W.2d at 895, that an action for involuntary manslaughter may have then been warranted. What this court is saying is the defendant by being inert, inactive and languishing in front of a movie, created the situation for a potential of, but not necessarily the prelude to, a certain disaster, but her inactivity did not manifest a conscious disregard of a risk of death to her child. Hence, she was properly charged and convicted of child endangerment, her conduct and her remorse just do not fit within the overt and active type of conduct which is elevated into the punishment meted out for an involuntary homicide.

The judgment is affirmed as to the conviction for child endangerment. The judgment for involuntary manslaughter is reversed and the defendant is discharged on that conviction.

All concur.

---

dant must have been of such a reckless or wanton character as to indicate on his part utter indifference to the life of another who is killed as a result thereof". *State v. Melton,* 326 Mo. 962, 33 S.W.2d 894.895 (1930). The Court in *State v. Millin,* 318 Mo. 553, 300 S.W. 694, 697 (1927), said "...not only must a death have ensued from the negligent act or omission...but there must be facts and circumstances in evidence tending to prove that such person was actuated at the time by a reckless disregard of the consequences of his act, from which the jury may reasonably infer the criminal intent...essential to guilt...for violation of our criminal statutes".