STATE of Missouri, Respondent,

v.

David M. MANWARREN, Appellant.

No. 25735.

Missouri Court of Appeals, Southern District, Division One.

July 27, 2004.

Kent Denzel, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Leslie E. McNamara, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Presiding Judge.

David M. Manwarren ("Appellant") appeals his conviction for one count of felony murder in the second degree, § 565.021, and two counts of endangering the welfare of child in the first degree, § 568.045.[1]

Viewed in the light most favorable to the verdict, *State v. Hunter*, 939 S.W.2d 542, 543 (Mo.App.1997), the following evidence was adduced at trial. Appellant began dating Amanda Walden shortly after Ms. Walden's son, Josh Polson ("Victim"), turned two years old. Eventually, Ms. Walden moved into Appellant's trailer home with him, but Victim continued living with his great-grandmother ("Great–Grandmother"). A few weeks after Ms. Walden moved in with Appellant, Victim came to live with them in the trailer home.

Several incidents between Appellant and Victim were described at trial. Only those pertinent to the charges will be addressed here. On one occasion, Appellant threw Victim up into the air and Victim's head went through the ceiling of the trailer home and left a hole in the ceiling. Ms. Walden told Appellant to stop because he could hurt Victim, and Appellant responded that he had done the same thing previously. Appellant said that Victim's head had made a hole in the ceiling at that time and that Victim was not injured by the incident.

On the evening of March 10, 2001, Ms. Walden went to Great–Grandmother's house and left Victim at the trailer home with Appellant. Shortly after Ms. Walden left the trailer home, Victim began to cry. Appellant put Victim in the bathroom for a "time-out" in hopes that Victim would stop crying. When Victim continued crying, Appellant "drug" Victim from the bathroom to the living room. Appellant told Victim to "shut the fuck up," grabbed Victim by the front of the shirt, shook him back and forth, and threw Victim onto the couch. Victim was still crying, and Appellant picked Victim up by the front of his shirt and held Victim "about eye level with [Appellant]." According to Appellant, Victim fell to the floor when Appellant lost his grip on Victim's shirt.

Victim was crying even more at this point. Appellant "leaned over [Victim], grabbed him by the front of his shirt, picked him up approximately eight to ten inches off the floor and violently slammed him on the floor saying 'Shut the fuck up.'" Shortly thereafter, Victim "stiffened up, stopped crying, and blood started coming out of his mouth." Appellant tried to revive Victim by slapping him on the face. When Victim failed to react, Appellant ran to a neighbor's house to call for help; however, no one was home.

Appellant returned to the trailer home, moved Victim to his car, and drove to the home of Phillip and Kelly Tuck. When he arrived, he went in and told them Victim was hurt and needed help. While Mrs. Tuck called 911, Mr. Tuck went to the car and brought Victim into the home. Victim had a large knot on his forehead, his

---

1. Statutory references are to RSMo 2000.

breathing was sporadic, he had blood in the corner of his mouth, and his eyes were rolled back. An ambulance arrived and took Victim to the hospital. Appellant went back to the trailer home to get Ms. Walden and to take her to the hospital. Appellant told Ms. Walden that he was in the bathroom when Victim fell off of a chair and hit his head.

While they were at the hospital, Taney County Sherriff's Deputy Richard Hill requested that Appellant and Ms. Walden write statements about what had happened. Appellant stated that while he was in the bathroom, Victim climbed onto a table and fell off.

Later that night, Victim was air-lifted to St. Johns Hospital in Springfield, Missouri. Victim had bruises on his forehead, chest, arms, legs, and buttocks, and he was unconscious. Victim was observed by medical personnel to have a large cephalhematoma in the midline of his forehead, swelling in the back of his eye, and his right pupil was dilated. Victim had swelling around his brain and a herniation of the brain. The bruises on Victim's head were consistent with being hit with a fist, and the bruises on his legs were consistent with a gripping injury. The injuries to Victim's abdomen were consistent with a blow to the abdomen and his head injuries were consistent with being propelled into a flat hard surface. Victim's injuries were not consistent with a fall from a table or chair or from being dropped on the floor. Rather, Victim's injuries were consistent with child abuse and "shaken-baby" syndrome.

On March 12, 2001, it was determined that Victim was brain dead, and he was pronounced dead at 10:19 a.m. on that day.

While Victim was in the hospital, Appellant was arrested, placed on a twenty-hour investigative hold, and taken to the Taney County jail. Deputy Brian Bailey advised Appellant of his *Miranda* rights,[2] and Appellant signed a waiver of his rights. Appellant first told Deputy Bailey that Victim had fallen off of a chair or table. Eventually, Appellant admitted that, in an effort to get Victim to stop crying, Appellant shook Victim, threw him onto the couch, dropped him on the floor, and slammed him into the floor. Appellant also admitted to "thrusting" Victim into the air on a prior occasion, but he said that he did not intend for Victim's head to hit the ceiling. Appellant admitted to Deputy Bailey that "I don't know what's wrong with me. I just get so fucking pissed off I can't help myself," and "I am mean, but I don't want anybody to know that."

At trial, Appellant testified in his own defense that when Victim would not stop crying, he forcefully sat him on the couch and went outside to smoke a cigarette. Appellant also stated that when he came back in the trailer home, Victim was still crying, so he picked Victim up by the front of his shirt, held him up at eye level, and lost his grip on the shirt. As a result, Victim fell to the floor. Appellant testified that after this fall, Victim was non-responsive and Appellant "jolted" him in an effort to elicit a response. Appellant stated that he did not intend to hurt Victim.

The jury returned a verdict finding Appellant guilty of two counts of endangering the welfare of a child in the first degree [3]

2. See *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).

3. One count related to the incident when Appellant threw Victim into the air and Victim

hit his head on the ceiling. The other count related to the events of March 10, 2001, which led to Victim's death.

and one count of felony murder in the second degree. Appellant was sentenced to five years' imprisonment for each charge of endangering the welfare of a child in the first degree and ninety-nine years' imprisonment for felony murder in the second degree. One of the five year sentences runs concurrent with the ninety-nine year sentence, and the other runs consecutive to the ninety-nine year sentence. Appellant now appeals, raising three points of trial court error.

■ In his first point on appeal, Appellant argues the trial court erred in denying his motion for judgment of acquittal at the close of the evidence because there was insufficient evidence for a reasonable juror to find beyond a reasonable doubt that Appellant knowingly created a substantial risk to Victim's health. Appellant asserts that "there was no evidence that [Victim's] head was in fact slammed into the ceiling or that [Appellant] knowingly did this; the evidence was that it was accidental and that [Victim] was not injured . . . ."

In reviewing a challenge to the sufficiency of the evidence, we determine "whether there is sufficient evidence from which a reasonable juror could have found the defendant guilty beyond a reasonable doubt." *State v. Langdon,* 110 S.W.3d 807, 811 (Mo. banc 2003). "In considering whether the evidence is sufficient to support the jury's verdict, we must look to the elements of the crime and consider each in turn." *State v. Grim,* 854 S.W.2d 403, 411 (Mo. banc 1993). This Court views the evidence and all reasonable inferences therefrom in the light most favorable to the State; however, we "will not supply missing evidence or give the state the benefit of unreasonable, speculative or forced inferences." *Langdon,* 110 S.W.3d at 811–12. Viewing the evidence in this manner, "we consider whether a reasonable juror could find each of the elements beyond a reasonable doubt." *Grim,* 854 S.W.2d at 411. The issue is essentially a determination as to whether there was evidence from which reasonable jurors could have found the accused guilty of this charge. *State v. Riggs,* 2 S.W.3d 867, 869 (Mo.App.1999).

Section 568.045 provides, in pertinent part: "1. A person commits the crime of endangering the welfare of a child in the first degree if: (1) The person knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old." According to section 562.016.3, a person acts knowingly "[w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." § 562.016.3(2). Section 568.045 does not require severe injuries that endanger a child's welfare, but rather that the act of the defendant himself creates a substantial risk of harm. *State v. Miller,* 985 S.W.2d 857, 858 (Mo.App.1998); *see also Riggs,* 2 S.W.3d at 873.

Appellant first argues there was insufficient evidence to demonstrate that his actions created a substantial risk of harm. He also asserts that the evidence did not show there was an *actual* danger to victim, as opposed to a *potential* danger to victim, because Victim was not hurt during the incident.

We note that, under the statute, there must be an actual risk to the life, body, or health of a child. *Hunter,* 939 S.W.2d at 545. Saliently, harm to the child does not have to occur to trigger application of the statute. *See Riggs,* 2 S.W.3d at 873.

At trial, Ms. Walden testified she saw Appellant pick Victim up off of the floor and throw him up in the air, which caused Victim's head to go through the ceiling of the trailer home and leave a hole in the

ceiling.[4] Ms. Walden also stated that she told Appellant "that he needed to stop because he was going to hurt [Victim]." Appellant testified at trial that "I picked [Victim] up and thrust him in the air, and a little higher than I intended to, and ... [Victim] hit the ceiling as I did so."[5]

A jury could reasonably conclude that a two-year-old child being thrown into the air in such a manner that his head creates a hole in the ceiling creates a substantial risk to the life, body, or health of that child. This would be the case even if the incident did not cause any actual harm to the child. See Riggs, 2 S.W.3d at 873. Accordingly, here there was substantial evidence supporting the jury's determination that Appellant created a substantial risk to the life, body, or health of Victim.

Appellant also argues the evidence was insufficient to show he *knowingly* created the substantial risk to the health of Victim. Appellant asserts his testimony proves the incident was accidental and, thus, he could not have acted knowingly.

■ "There is no bright line test to determine whether or not a person's actions knowingly create[s] a substantial risk to the health of a child." *Hunter*, 939 S.W.2d at 545. In determining whether actions rise to this level, we look at the totality of the circumstances as presented by the evidence. *Id.* The mental element of the defendant's knowledge may be proven by direct evidence and reasonable inferences drawn from the circumstances surrounding the incident. *Riggs*, 2 S.W.3d at 873.

When Ms. Walden told Appellant "that he needed to stop because he was going to hurt [Victim]," Appellant responded that, on a separate occasion, Appellant had engaged in the same activity and Victim's head went through the ceiling without any apparent injury to Victim.

While Appellant maintains he did not intend to hurt Victim and, in fact, Victim did not cry or *appear* injured by the incident, it is left to the jury to determine the weight, reliability, and credibility of Appellant as a witness. *State v. Bell*, 66 S.W.3d 157, 163 (Mo.App.2001). It is within the jury's province to believe all, some, or none of Appellant's testimony in arriving at its verdict. *State v. Stiegler*, 129 S.W.3d 1, 3 (Mo.App.2003). Thus, the jury was not obligated to accept Appellant's version of the events.

Ms. Walden's testimony that Appellant admitted he had previously thrown Victim into the air and that Victim's head went through the ceiling could lead a jury to determine that Appellant acted knowingly in repeating the same action at a later time. Based on the totality of the circumstances surrounding the instant incident, there was sufficient evidence for the jury to determine that Appellant knowingly created a substantial risk to the life, body, or health of Victim. *See Hunter*, 939 S.W.2d at 545. Point One is denied.

■ In his second point on appeal, Appellant alleges the trial court abused its discretion in permitting the State to elicit evidence from Great–Grandmother that she had been allowed to enter Appellant's home to get clothes for Victim to be buried in. Appellant claims such testimony was not logically or legally relevant and was presented solely to inflame the passions of the jury, which caused the jury to convict Appellant out of sympathy for Victim and

---

4. A photograph of the hole in the trailer home ceiling was introduced into evidence and shown to the jury.

5. Doctor James Spindler, the medical examiner, testified at trial that Victim had bruises to his scalp that were consistent with "being propelled into a flat hard surface."

his family, rather than on the basis of a fair determination of his guilt.

We observe that trial courts have broad discretion to admit or exclude evidence. *State v. Williams*, 97 S.W.3d 462, 468 (Mo. banc 2003). We review decisions to admit or exclude evidence for an abuse of discretion. *Id.* In reviewing the trial court's errors on direct appeal, we review " 'for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.' " *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996) (quoting *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc 1990)).

To be admissible, evidence must be logically and legally relevant. *State v. Kennedy*, 107 S.W.3d 306, 311 (Mo.App. 2003). Evidence is logically relevant if it tends to make the existence of a material fact more or less probable; evidence is legally relevant if its probative value outweighs its prejudicial effect. *Id.*

The State concedes that Great–Grandmother's testimony regarding her visit to Appellant's home after Victim's death was not relevant to any material fact in the case, and the trial court erroneously admitted this testimony. Thus, we are left to determine whether the admission of this testimony was so prejudicial that it deprived Appellant of a fair trial.

The question in determining the prejudicial effect of the improperly admitted evidence is whether "the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." *State v. Barriner*, 34 S.W.3d 139, 150 (Mo. banc 2000).

While it is possible Great–Grandmother's testimony engendered feelings of sym-

pathy for Victim and his family, the State did not emphasize this testimony during closing arguments. Furthermore, there was overwhelming evidence in the record that Appellant was guilty of the crimes charged, as set out previously.

Appellant has not directed this Court to any evidence that Great–Grandmother's testimony was so prejudicial that it deprived Appellant of a fair trial. *See Tokar*, 918 S.W.2d at 761. We find, while the trial court may have abused its discretion in allowing Great–Grandmother's testimony, such error was not overly prejudicial to Appellant. Point Two is denied.

Appellant's third and final point on appeal alleges the trial court "plainly erred in permitting the State to argue [Victim's] personal characteristics or relative worth, and to attack [Appellant's] character by misstating the evidence...." Appellant argues the State's closing arguments "led the jury to convict [Appellant] for improper reasons wholly unrelated to his guilt." Appellant acknowledges he did not object to either of the comments in question.

By failing to object to the prosecutor's comments made during closing argument, "[D]efendant failed to preserve his claims of error as to those comments for review." *State v. Edwards*, 116 S.W.3d 511, 536 (Mo. banc 2003). Appellant requests this Court to review his claims for plain error under Rule 30.20 and claims that the prosecutor's comments were so prejudicial that the trial court erred in not, *sua sponte*, directing the jury to disregard the improper argument and directing the prosecutor to confine his remarks to the evidence and issues raised in the instructions.

"Courts especially hesitate to find plain error in the context of closing argument because the decision to object is often a matter of trial strategy, and 'in the absence of objection and request for relief,

the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention.' " *State v. Mayes*, 63 S.W.3d 615, 632–33 (Mo. banc 2001) (internal citation omitted) (quoting *State v. Clemmons*, 753 S.W.2d 901, 907–08 (Mo. banc 1988)). We will reverse a conviction for plain error in closing arguments only in cases where it is shown that the improper argument "had a decisive effect on the outcome of the trial and amounts to manifest injustice." *Edwards*, 116 S.W.3d at 537. "Closing arguments 'must be interpreted with the entire record rather than in isolation.' " *Id.* (quoting *State v. Graham*, 916 S.W.2d 434, 436 (Mo.App.1996)).

▆ As to Appellant's claim that the prosecutor improperly argued personal characteristics and worth of Victim, the prosecutor stated during closing arguments:

> Now, what we're trying to do here is be fair. We're looking for justice, like the scales of justice, so everything evens out fair and square. So, what was the value of [Victim]? What was his value? So, if we're going to talk about scales of justice, let's look at what his value was. He was two years old. After [Appellant] got through with him, he had no brain, he had no life, and he's been blinded.
>
> How do we know the man, who had 80 years taken away from his life, what he would mean to this country? We don't know. We never will. He took 80 years from this boy.

While the prosecutor's comments may have appealed to the jurors' emotions, we cannot say that these comments had a *decisive effect* on the jury's determination of guilt. When viewed in light of the overwhelming evidence of Appellant's guilt presented during the trial, the trial court's decision not to *sua sponte* chastise the prosecutor or instruct the jury to ignore

the statements does not rise to the level of manifest injustice. *See Kennedy*, 107 S.W.3d at 316.

Appellant also claims the trial court plainly erred in allowing the prosecutor to misstate the evidence. During closing arguments, the prosecutor argued that Appellant had an opportunity to tell the doctors treating Victim the truth about the nature of Victim's injuries but that he chose, instead, to maintain his story that Victim fell off of a chair or table. The prosecutor stated:

> You know, [Appellant] had a choice to tell the doctor at a very important time, but he chose to protect himself, and I couldn't think of this, but in some way it was kind of like the story of the guy who was going down the road and he was attacked and left to the side of the road to bleed and die, and along came a lot of other people that passed him by, and the story goes on and tells the benefits of being a good Samaritan; but, what the story doesn't tell you is the kind of man that left him, when he needed help on the side of the road, to bleed and die. That's [Appellant]. That's him, right there.

Appellant argues that this part of the prosecutor's closing arguments constituted a misstatement of the evidence and, thus, denied Appellant a fair trial.

We initially turn our attention to the first portion of the prosecutor's statements.

The evidence showed that Appellant shook, hit, and dropped Victim until he was unconscious and had to be taken to the hospital. The evidence also showed that Appellant told everyone, including the doctors, that Victim had fallen off a table or chair. Appellant admitted during his testimony that when he first arrived at the hospital, shortly after Victim was taken there, he did not tell the doctors what had happened to Victim. The prosecutor

asked Appellant, "[W]hen you had an opportunity to tell the doctors exactly what happened to help save his life, you chose to save your own life. Isn't that true?" Appellant responded, "I didn't tell the truth." Appellant also testified that the entire time he was in custody, he was aware that Victim was in critical condition. Therefore, we cannot say that the prosecutor's closing statements that Appellant had the opportunity to tell the doctors the truth about Victim's injuries at a critical time in his treatment and chose not to do so was a misstatement of the evidence.

As to the analogy employed by the prosecutor, relating to the people that passed an injured man by on the side of a road, Appellant claims the prosecutor incorrectly argued to the jury that Appellant "could have saved the boy by admitting his guilt." Appellant mischaracterizes the prosecutor's closing statements. The prosecutor never stated that Appellant caused Victim's death by not immediately telling the doctors the truth. Rather, the prosecutor's argument was that Appellant did not come forward and offer the information he had in an attempt to help Victim, much like the people in the analogy. The prosecutor never made a claim that had Appellant come forward, Victim might have been saved. Just as important, Appellant fails to show this Court how these closing arguments had any decisive effect on the jury, given the overwhelming evidence of his guilt. *See State v. O'Haver*, 33 S.W.3d 555, 561–62 (Mo.App.2000). Point Three is denied.

The judgment and sentence of the trial court is affirmed.

PREWITT and GARRISON, JJ., concur.